COMMONWEALTH *vs.* ANDRE WHITE.

No. 96-P-1391.

Suffolk. March 12, 1997. - January 21, 1998.

Present: ARMSTRONG, KAPLAN, & GREENBERG, JJ.

*Search and Seizure,* Threshold police inquiry. *Practice, Criminal,* Motion to suppress. *Constitutional Law,* Search and seizure.

In a criminal proceeding, the judge did not err in refusing to consider a motion to suppress evidence, which motion was based on an assertion of lack of probable cause to arrest and was filed the day prior to trial, and in declining to hold a hearing on the motion, where the judge concluded that the material submitted in support of the motion raised no substantial question as to the propriety of police officers' stop of the defendants. [171-174]

INDICTMENTS found and returned in the Superior Court Department on March 1, 1994.

A motion to file a suppression motion late was heard by *Patrick F. Brady,* J., and the cases were tried before him.

*Russell J. Redgate* for the defendant.

*Joseph M. Makalusky,* Assistant District Attorney, for the Commonwealth.

ARMSTRONG, J. On evidence that the defendant shot and killed one man and injured another in Boston's "Combat Zone," a jury convicted the defendant of manslaughter, assault and battery by means of a dangerous weapon, and unlawful possession of a firearm. On appeal, the defendant's principal argument is that the judge erred in refusing to consider a late-filed suppression motion and in failing to hold an evidentiary hearing on the proposed motion.

The evidence most favorable to the Commonwealth warranted the jury's finding facts along these lines. On February 18, 1994, around 3:30 A.M., Clark McLean and Christopher Sneed were standing on the corner of Harrison Avenue and Kneeland Street in Boston. The defendant and the codefendant,

John Davis,[1] approached and inquired how they could hire a prostitute. A prostitute who worked for Sneed came around the corner, and the defendant and Davis indicated that they wished to hire her. After negotiations, the parties settled on a price of $250. The four men walked to Sneed's car, which was parked about a block away, near Bernie's Pub. There they waited for the prostitute, who had gone elsewhere, to return. Sneed sat in the driver's seat and McLean in the front passenger seat. Another prostitute — a thirteen year old named T B — sat in the rear passenger seat next to a Rottweiler dog.

The four men were talking amicably until the defendant, who was leaning into the car through the driver's window, said, "What's up?" to Sneed, who in turn responded, "What's up?" The defendant (according to McLean and T B ) then pulled out a gun, shot Sneed in the chest, and then shot McLean twice in the leg. McLean fled from the car and the defendant began chasing him and continued shooting at him while McLean ran down Harrison Avenue, turning left onto Essex Street. McLean came to the Pilgrim Theater where he was assisted by patrons standing outside. T B, concerned for McLean, her boyfriend, arrived at the Pilgrim Theater and accompanied McLean to a nearby hospital, New England Medical Center.

Meanwhile, Officer Edmund Rautenberg, who was located at the corner of Tremont and Stuart Streets, was told by a passing taxi driver of the incident near Bernie's Pub. Rautenberg went to Bernie's and found Sneed unconscious and lacking a pulse. Based on information from people at the scene, Rautenberg broadcast that two black males were running up Harrison Avenue toward Harrison Avenue Extension to Hayward Place.

Responding to the transmission, Officers Donald Lee and Christopher Boyle drove toward the area. At some point, Boyle left the cruiser, while Lee drove down Washington Street toward Downtown Crossing. Lee observed two black males entering a car parked on Washington Street in front of Lafayette Place. It was shortly after 3:30 A.M. There were no other cars, traffic, or pedestrians in the area. Lee turned on his blue lights and siren. As Lee drew nearer, the parked car accelerated at a "good rate of speed," turning left onto Temple Place. The car stopped approximately three quarters of the way up Temple

---

[1]Davis was acquitted of all charges.

Place and the two passengers started to leave the car; Lee at gunpoint ordered them back into the car. Officer Ted Hendricks, in his cruiser, with sirens and lights activated, turned down Temple Place (a one-way street) to block the vehicle.[2] Both Hendricks and Lee saw the defendant place something on the ground; as Lee approached, he saw that it was a gun. Ballistics tests later revealed that the gun had fired the bullet found in Sneed's body by the medical examiner.

Lee brought the defendant to New England Medical Center where McLean and T B identified him as the shooter. McLean had suffered two gunshot wounds to his leg; Sneed died of the gunshot wound to his chest.

The defendant testified at trial that he and Davis were negotiating with Sneed and McLean over the price of the prostitute; that when Sneed learned that they did not really have the money, Sneed said, "So you and your friends are playing with my f—ing time?" Sneed then pulled out a gun. Fearing that Sneed was about to shoot him, the defendant grabbed his hand and turned the gun toward Sneed, which then "went off." The gun dropped in Sneed's lap and the defendant, now fearful that McLean would shoot him with a dark colored object he said he saw in McLean's hand, picked Sneed's gun up and fired at McLean. The defendant denied chasing McLean and shooting at him but said he was trying to avoid McLean and any possible repercussions. Carrying Sneed's gun, the defendant left the area, met up with Davis and entered the car of a friend of Davis's who happened to be on Washington Street. The friend pulled over in response to the police; the defendant admitted that he threw the gun out of the car.

On the day prior to trial (scheduled over a year after his indictment), the defendant requested and was granted permission to join in Davis's motion to file a suppression motion late. Attached to Davis's motion were affidavits by Davis and his attorney claiming that he was arrested without probable cause. The judge expressed concern that the motion was filed at the eleventh hour. He asked both defense counsel to explain why they had not filed suppression motions earlier. They responded

---

[2]The sequence was not clear. Hendricks testified that his turning the wrong way down Temple Place caused the suspects' vehicle to stop. Lee's testimony has the passengers leaving the vehicle as Hendricks' cruiser turned into Temple Place. In our view of the case nothing turns on the inconsistency.

that they did not realize there were grounds for a suppression motion until their investigator belatedly interviewed one Bernard Slowey, the owner of Bernie's Pub, who they understood from Rautenberg's police report had supplied the officer with the information about the two suspects and the direction in which they were heading. A defense investigator ultimately spoke to Slowey, who (according to the attorneys) claimed that he had not seen anything occur.

The judge then read the supporting affidavits of Davis and his attorney, which were general and conclusory, and the police reports. (There were no affidavits from the investigator or from Slowey.) The judge allowed defense counsel to make legal arguments as to why the proposed suppression motion had merit. The judge denied the motion with prejudice, saying: "I'm not satisfied that the late interview with Slowey — Mr. Slowey — is anything other than defense investigator's lack of diligence. That doesn't satisfy me that there is good cause to allow the motion to be heard late. Secondly, I'm not satisfied that the affidavit presented by Davis and by counsel, Mr. Chapman, are sufficient to lead me to believe that justice would not be done if I didn't hear the motion."

On appeal, the defendant argues that the judge should have allowed the defendant to file a suppression motion late because the discovery that Slowey had not in fact supplied information to Rautenberg constituted good cause to allow the late filing. The defendant argues that the judge should have determined, based on his review of the affidavits and reports and on counsels' arguments, that the motion likely would have succeeded because no known informant relayed information to Rautenberg who in turn broadcast the information to the officers who stopped the defendant; moreover, he argues, the police could not stop the defendant based on the general description provided.[3]

---

[3]Under Mass.R.Crim.P. 13(d)(2)(A), 378 Mass. 873 (1979), a pretrial motion must "be filed within seven days after the date set for the filing of the pretrial conference report . . . or at such other time as the judge or special magistrate may allow. Within seven days after a pretrial motion is filed, the clerk shall schedule a hearing thereon, but the judge or special magistrate for cause shown may entertain such motion at any time before trial." Here, the judge determined that the "new" information supplied by Slowey could have been discovered in the year between the indictment and the trial; Slowey ap-

The information supplied by the conclusory affidavits, even if augmented by counsel's second-hand recitation of the investigator's conversation with Slowey, did not raise a substantial concern that the police lacked reasonable suspicion to stop the defendant. The report of the responding officer, Rautenberg, which is in the record, indicated that he talked with Slowey, but it did not say that Slowey was the source of the broadcast information concerning the direction in which the defendant and Davis were heading and the fact that they were black. From his testimony at the trial, we learned that Officer Rautenberg talked with bystanders, but neither the report nor the testimony identified the bystanders who were the source of the broadcast information. Even without an informant identified by name, the information about the suspects "was provided by bystanders who could have been identified, thus reducing to some extent the likelihood of fabrication." *Commonwealth* v. *Stoute*, 422 Mass. 782, 790-791 (1996). There is no plausible reason to doubt the statements of victims or bystanders who, in the immediate aftermath of a crime, say, in effect, that the perpetrators were of a particular skin color and that "they went that way." See *Commonwealth* v. *Atchue*, 393 Mass. 343, 347-349 (1984); *Commonwealth* v. *Stoute, supra.*

At the time Officer Lee activated his sirens and blue lights in an attempt to stop the vehicle, he had a reasonable, articulable suspicion that the two men entering the car might have been responsible for the shooting which had occurred minutes before just blocks away. The codefendants, two black men, were located in the general area toward which the perpetrators were said to be heading, were traveling as a pair, and were the only people Lee saw in a largely deserted commercial zone at a time after 3:30 A.M. It was appropriate for Lee to want to question the men and, on seeing them entering a car, to activate his blue lights to cause the car to remain in place. Instead, the car moved

parently was the owner of Bernie's throughout the period. "If . . . counsel was aware of the grounds of the suppression motion prior to trial but did not file the motion during the relevant time period, it is entirely discretionary with the [j]udge whether or not to permit the motion to be heard." Smith, Criminal Practice and Procedure § 1288 (2d ed. 1983). (As to the more limited application of that principle to suppression motions based on Miranda grounds, see Smith, *supra* at § 1288 n.2 [Supp. 1997], citing *Commonwealth* v. *Adams*, 389 Mass. 265, 269-270 [1983], and *Commonwealth* v. *Woods*, 419 Mass. 366, 370 & n.7 [1995].)

away at a high rate of speed. Under these circumstances, it was reasonable for Lee to pursue the car so as to be able to conduct a threshold inquiry. See *Commonwealth* v. *Mercado*, 422 Mass. 367, 371 (1996) (evasive behavior, proximity to a crime scene, or matching general description of suspect each insufficient to establish reasonable suspicion but may in combination "allow the police to narrow the range of suspects to particular individuals"). Compare *Commonwealth* v. *Wren*, 391 Mass. 705, 706-708 (1984) (flight by one under reasonable suspicion justifies pursuit); *Commonwealth* v. *Stoute, supra.*

The defendant further argues that the stop rose to the level of an "arrest" requiring probable cause when the vehicle was blocked in by Hendricks's cruiser and Lee ordered him and Davis back into the car at gunpoint. The use of force, however, to effect a stop and to cause a show-up in the immediate aftermath of a crime does not necessarily amount to an arrest requiring probable cause. See *Commonwealth* v. *Williams*, 422 Mass. 111, 118 (1996); *Commonwealth* v. *Padolfino*, 33 Mass. App. Ct. 96, 98 (1992); *Commonwealth* v. *Andrews*, 34 Mass. App. Ct. 324, 328-329 (1993). Under Massachusetts law, the pursuit of the vehicle, blocking it in with cruisers, and the approach with guns drawn amounted to a "seizure" under art. 14 of the Declaration of Rights of the Massachusetts Constitution, *Commonwealth* v. *Stoute, supra* at 785-789, but the seizure was justified by antecedent reasonable suspicion that the occupants were engaged in unlawful activities of a type that justified a *Terry* stop.[4] *Id.* at 789-791. Compare *Commonwealth* v. *Williams, supra* at 116-119; *Commonwealth* v. *Fitzgibbons*, 23 Mass. App. Ct. 301, 306-308 (1986). Bearing in mind that the information on which the police were acting concerned the use of a firearm in a manner to cause serious injury or (as later materialized) death, we think that the judge would have no basis for ruling that blocking off the suspects' vehicle and ordering them back into the car as they attempted to alight was other than a reasonable response to a situation fraught with both danger and exigency. The attempt to jettison the firearm obviously deepened the level of suspicion, and the subsequent detention and the show-up were called for and appropriate. We agree

---

[4]*Terry* v. *Ohio*, 392 U.S. 1 (1968).

with the judge's assessment that the affidavits furnished by Davis and his counsel raised no substantial question as to the propriety of the stop.[5]

*Judgments affirmed.*

---

[5]The defendant's argument that his trial counsel was ineffective for failure to file a timely suppression motion is without merit, because it has not been shown that the absence of such a motion "likely deprived the defendant of an otherwise available, substantial ground of defence." *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974). See *Breese* v. *Commonwealth*, 415 Mass. 249, 256 (1993) ("Because a motion to suppress would have been unsuccessful, the defendant's claim that trial counsel's failure to move to suppress . . . constituted ineffective assistance is meritless"). Nor is there any merit to the defendant's argument that the judge abused his discretion in permitting the defendant's prior New York convictions of first and second degree robbery to be used for impeachment purposes. As in *Commonwealth* v. *Walker*, 401 Mass. 338, 345-346 (1987), the usual instructions were given, and the prosecutor did not allude to the convictions in his closing argument.