COMMONWEALTH *vs.* WILLIAM F. DOOCEY, JR.

No. 00-P-922.

Suffolk. August 29, 2001. - November 25, 2002.

Present: LAURENCE, MASON, & BERRY, JJ.

*Constitutional Law,* Search and seizure. *Search and Seizure,* Threshold police inquiry, Protective frisk.

A police officer's investigation of a report of gunshots fired in a public park that led the officer to make an investigatory stop in close proximity to the park within moments of the report of shots being fired, early in the morning when the streets were deserted and the defendant was the only person present in a very narrow zone within which the suspect was seen headed, and in circumstances in which the officer knew that the suspect being pursued was carrying a gun that recently had been fired, established objective, specific, and articulable facts reaching the level of reasonable suspicion that the defendant had been involved in the criminal activity of the shooting in the park, and that, accordingly, the officer's investigatory stop and frisk were constitutionally justified. [553-558]

COMPLAINT received and sworn to in the South Boston Division of the District Court Department on January 1, 1998.

A motion to suppress evidence was heard by *Robert P. Ziemian,* J., and the case was heard by *Joseph M. Walker, III,* J.

*John T. Diamond, III,* for the defendant.

*Kajal K. Chattopadhyay,* Assistant District Attorney, for the Commonwealth.

BERRY, J. This appeal involves an investigatory stop and frisk in the context of rapidly unfolding events, commencing with a report of shots fired, fleeing suspects, a fleeting view by an eyewitness yielding only a fragmentary description of the shooter, quickened police patrol of the subject area, followed, within moments, by a stop on the street of a suspect believed to be armed and dangerous and, then, a patfrisk which in fact

yielded a weapon.[1] The defendant contends that there was not reasonable suspicion to justify the stop and link him, by constitutionally sufficient markings, to the criminal activity of the shots fired in the park. We conclude that the police actions met constitutional measure, and, accordingly, we affirm the denial of the defendant's motion to suppress.

1. *Background precedent to the stop*.[2] At approximately 3:24 A.M. on January 9, 1998, the Boston police radio turret broadcast a report of gun shots at the M Street Park in South Boston. The dispatch to cruisers patrolling the area advised of a just-received 911 call from an identified citizen-witness to the gun fire. The dispatcher reported to the cruisers on patrol that a witness, whose residence was directly across the street from the park, had heard, and called the police to report, "shots fired" in the park.[3] The bulletin to the cruisers stated that the witness had seen two male suspects dressed in black clothing leaving the park and heading down Second Street in the direction of L Street. The dispatcher immediately directed three cruisers to patrol the area. Officer Young was in one of those cruisers. A different officer, on patrol in a separate cruiser, inquired via radio transmission back to the dispatcher whether the witness was identified and requested confirmation of that point and any further detail that might be garnered. The dispatcher called the witness back and asked for additional information. In a second broadcast, the dispatcher relayed to the cruisers on patrol that the witness saw two males leaving the park, but the witness "couldn't see any faces, just males dressed in black."

Two minutes after the initial broadcast, at approximately 3:26 A.M., the turret transmitted another broadcast, reporting that an officer had stopped and frisked a man found on Second Street

---

[1]The defendant was charged with possession of an unlicensed firearm and ammunition and discharge of a firearm within five hundred feet of a building. After denial of the motion to suppress, a jury-waived trial was held. The defendant was convicted of the two unlawful possession offenses and was found not guilty of discharging a firearm. The sole issue raised on appeal challenges the denial of the motion to suppress.

[2]The facts are taken from the motion judge's findings, the uncontroverted evidence at the suppression hearing, and the turret tape from the Boston police department, which was admitted as an exhibit.

[3]In the 911 call, the witness provided his telephone number and address. A police detail was immediately directed to interview him.

between M Street and L Street. The location of this encounter was approximately 30 yards from the park.[4] That officer relayed to the home-base turret, "this kid has no weapon on him so there still might be one or more out there floating around with a gun." After a brief inquiry and computer check, the officer determined that the youth who had been stopped, identified as Kevin Akerley, was not one of the suspects. Akerley, however, had relevant information and stated he had just seen two men continuing down Second Street in the direction of L Street. This information was also radioed back to the turret and transmitted to the cruisers on patrol.

Officer Young, having heard all of these bulletins, directed his patrol over a grid pattern, cruising the street blocks covering the area of Second Street and its intersecting streets, K Street to I Street, as well as the parallel streets of East Broadway and Third Street. By calibrating the time since the shooting and the distance from the park, Young calculated this segment of the grid would encompass the range that a person could reach from the park. The streets were deserted; Young saw no person within the initial sweep of this several block grid. Then, at approximately 3:36 A.M., twelve minutes after the original bulletin, as Young turned back onto Second Street from I Street, he saw the defendant walking on the left side of Second Street. The defendant was wearing a dark navy blue nylon jacket and blue jeans. This location was approximately one half mile from the park — within the zone reachable by Young's distance calculations.

Young radioed back to the turret, providing his location and a description of the defendant: "a white male, all dark clothing." There was a cross-response from another officer: "Bobby, be careful — my guy's [a reference to the stopped man, Akerley] saying two people ran past him down East 2nd St. That would be probably about where you are now." The dispatcher requested additional units to assist Officer Young.

His cruiser headlights and overhead lights were off, and Young did not activate the siren or the cruiser's public address system. When Young's cruiser approached, the defendant turned

---

[4]The streets are marked in a grid pattern of parallel streets designated by numbers and intersecting streets designated by alphabetic letters.

and looked in that direction, and, as the cruiser drew closer, the defendant kept looking over his shoulder while he continued walking away.[5] Young stopped the cruiser about two car lengths from the defendant. As Young got out of the cruiser, his service revolver was drawn. However, he held the weapon in his right hand, hidden alongside his leg. The defendant appeared uneasy and possibly intoxicated. Young asked the defendant where he was coming from. The defendant responded that he had been at a friend's house on O Street. Young told the defendant he was looking for an individual who was involved in a shooting. At that point, fearing for his safety, Officer Young conducted a patfrisk. He felt a hard object that felt like a gun in the back belt area of the defendant's pants, lifted the defendant's jacket and saw the butt of a gun. He seized the gun and arrested the defendant.

2. *Constitutional analysis of the investigatory stop.* By long-standing precedent, our courts "have consistently sustained the right of a police office[r] to make a threshold inquiry where suspicious conduct gives the officer reason to suspect that a person has committed, is committing, or is about to commit a crime. Further, we have upheld the frisk incident thereto where the police officer has reason to believe that the individual is armed and dangerous." *Commonwealth* v. *Silva*, 366 Mass. 402, 405 (1974). In this case, the two-staged analysis, first of the investigatory stop, and second of the ensuing frisk, conflates and turns on resolution of the first stage, i.e., whether the stop meets constitutional measure. This is so because the gunfire accentuated the menace involved in pursuit, demonstrating not only that the suspect being sought was armed and dangerous, but also was ready, willing, and able to use that firepower, having just discharged the weapon. Thus, in this case, given the peril of an armed suspect, who by shots fired had actualized the risk of danger, if the stop was constitutionally justified, the frisk was also justified.

Constitutional analysis of the stop involves independent judicial review of "the historical facts to determine on our own whether an objectively reasonable police officer would have

[5]Young did not observe the defendant making any furtive gestures as he approached him nor any motions toward his waistband or like activity.

been warranted in having a reasonable suspicion of criminal activity." *Commonwealth* v. *Alvarado*, 423 Mass. 266, 269 (1996). In this case, the central issue presented in our review is whether, when viewed objectively, there were specific articulable facts and inferences that linked the defendant back to the point of origin of the commission of the crimes associated with the shots fired in the park.[6]

The determination of this issue may appropriately be analyzed against the axis of four pivotal cases — all of which involved stops in circumstances resemblant of this case. The pivotal cases at one end of the axis are *Commonwealth* v. *Mercado*, 422 Mass. 367 (1996), and *Commonwealth* v. *White*, 44 Mass. App. Ct. 168 (1998), in which the respective stop and frisk at issue was constitutionally permissible. The pivotal cases at the other end of the axis are *Commonwealth* v. *Cheek*, 413 Mass. 492 (1992), and *Commonwealth* v. *Grinkley*, 44 Mass. App. Ct. 62 (1997), in which the respective stop and frisk did not meet constitutional muster. Along the constitutional axis limned by these four leading cases lies a host of other pertinent cases involving investigatory stops that inform the interstices.

From the construct of these cases and the methodology of analysis therein emerges a pattern of recurring markings deemed pertinent to resolution of the question of whether a particular investigatory stop meets constitutional measure. While not all-encompassing (as no compendium of such markings can be totally inclusive), significant analytic factors identified in the caselaw include, but are not limited to, (1) the particularity of the descriptive characteristics which distinguish the suspect from other individuals; (2) the population of individuals in the area at the relevant time for which the distinguishing characteristics must serve as a separator for purposes of identifying the

---

[6]Because the informant provided his name, address, and telephone number to the police in his 911 call, the defendant concedes the informant's reliability. The defendant proceeds to base his appellate claim on an alleged failure of the informant's basis of knowledge. However, because the informant was an eyewitness to the events he described, the basis of knowledge prong was satisfied. See *Commonwealth* v. *Smigliano*, 427 Mass. 490, 492 (1998). See also *Commonwealth* v. *Lubiejewski*, 49 Mass. App. Ct. 212, 214-215 (2000).

suspect[7]; (3) the physical proximity between the place of the reported criminal activity and the place of the investigatory stop[8]; (4) the length of time between the reported criminal activity and the investigatory stop, as well as the temporal setting within which the criminal event occurs (for example, in the very late night or very early morning hours); (5) the actions of the suspect upon the initial police encounter, including evasive or unusual behavior,[9] which includes, but is not limited to, fur-

---

[7]See, e.g., *Commonwealth* v. *Willis*, 415 Mass. 814, 815, 818-819 (1993) (informant tip gave detailed description of suspect, including distinctive characteristics, sufficient to form reasonable suspicion); *Commonwealth* v. *Mercado*, 422 Mass. 367, 369-371 (1996) (police radio report and description given by witness narrowed range of possible suspects to two males of Hispanic descent; reasonable suspicion found). Contrast *Commonwealth* v. *Cheek*, 413 Mass. 492, 496 (1992) (reasonable suspicion not found where "the description of the suspect as a 'black male with a black 3/4 length goose' could have fit a large number of men who reside in [the area]. . . . The officers possessed no additional physical description of the suspect that would have distinguished the defendant from any other black male in the area"); *Commonwealth* v. *Grinkley*, 44 Mass. App. Ct. 62, 66-67 (1997) ("merely general[ ] descript[ions] of race, ethnic identity, and location in a public place normally frequented by [certain individuals] — all obvious, non-incriminating facts," do not provide specific articulable detail); *Commonwealth* v. *Mock*, 54 Mass. App. Ct. 276, 277, 282-283 (2002) (description of suspect as black man carrying bulky object under his clothing did not create reasonable suspicion).

[8]See, e.g., *Commonwealth* v. *White*, 44 Mass. App. Ct. 168, 172 (1998) (police had reasonable, articulable suspicion when, inter alia, codefendants were "just blocks away" from where shooting occurred and "located in the general area towards which the perpetrators were said to be heading . . . and were the only people . . . in a largely deserted commercial zone at a time after 3:30 A.M."); *Commonwealth* v. *Gunther G.*, 45 Mass. App. Ct. 116, 118 (1998) (suspects "close by the area where the shooting was reported, and with no one else on the street at that late hour," inter alia, "reasonably supports a conclusion that they were persons possibly involved in the reported incidents" [footnote omitted]); *Commonwealth* v. *Foster*, 48 Mass. App. Ct. 671, 672-673, 676 (2000) (reasonable suspicion when, inter alia, police see suspects matching physical description on same street and headed in same direction as informant indicated).

[9]See, e.g., *Commonwealth* v. *Rock*, 429 Mass. 609, 612-613 (1999) (where "the defendants were sweating, nervous, breathing heavily, and looking at each other and in all directions . . . [and one] defendant kept moving so as not to allow the officers to see his right side [and] [o]ne officer saw a pronounced bulge protruding under the defendant's shirt," inter alia, supports reasonable suspicion); *Commonwealth* v. *Gunther G.*, 45 Mass. App. Ct. at 119 (defendant's backing away from police, pointing and stating "they're

tive gestures[10]; (6) whether there is independent police corroboration of the report of the criminal activity; (7) the geographic boundaries where the suspect may reasonably be expected to be found; and (8) the characteristics of the place of the suspected criminal activity (including whether it is a high crime area — a debated determinant).[11]

Certain of these constitutional markings take on a different hue where firearms are involved, and that hue modulates even more where the report is one of criminal activity limited to possession of a firearm, versus a report of a gun having been fired or likely to be fired — the latter criminal activity being deemed to pose an imminent threat to public safety and not merely a question of possession. It is the case that "the report of the carrying of a firearm is not, standing alone, a basis for having a reasonable suspicion of criminal activity . . . . Our cases have not yet declared reasonable suspicion warranted simply on a report of gun possession just because this country has problems

down there" is "type of '[e]vasive conduct, although stopping short of headlong flight, [that] may inform an officer's appraisal of a streetcorner encounter,' " quoting from *United States* v. *Lender*, 985 F.2d 151, 154 [4th Cir. 1993]).

[10]*Commonwealth* v. *Va Meng Joe*, 425 Mass. 99, 106 (1997) (furtive act of defendant stepping out of his automobile while stopped at red light and reaching into his pocket as police approached "is an additional factor that allows us to conclude that, at the time of the search, the police officers had probable cause to believe that the defendant had committed, or was committing, a crime"); *Commonwealth* v. *Rivera*, 27 Mass. App. Ct. 41, 42-44 (1989) (act of turning back and plunging plastic bag into front of pants in one movement "at the approach of strangers or law officers [is a] strong indicia of mens rea, [and is a] proper factor[] to be considered in the decision to make an arrest," quoting from *Sibron* v. *New York*, 392 U.S. 40, 66-67 [1968]). Contrast *Commonwealth* v. *Hooker*, 52 Mass. App. Ct. 683, 686-687 (2001) ("The defendant's looking back at the following [unmarked police] vehicle before the stop is not remarkable . . . . Not every turn of the head is a furtive gesture").

[11]See, e.g., *Commonwealth* v. *Cheek*, 413 Mass. at 496 ("that the area where the police observed the defendant was a 'high crime area' is not persuasive. This factor contributes nothing to the officers' ability to distinguish the defendant from any other black male [in the area]"); *Commonwealth* v. *Pierre P.*, 53 Mass. App. Ct. 215, 216-219 (2001) (large group of youths loitering in high-crime area insufficient to justify police stop). Contrast *Commonwealth* v. *Fisher*, 54 Mass. App. Ct. 41, 45 (2002) (high crime area considered part of aggregated circumstances giving rise to reasonable protective frisk).

with the unlawful use of guns." *Commonwealth* v. *Alvarado*, 423 Mass. at 271, 273. However, while mere possession may not move the calculus, in circumstances where the gun presents an imminent threat because of shots just fired, or likely to be fired, and thereby presents a "suggestion of threats of violence, acts of violence, impending criminal activity, or concern for public safety," there is an edge added to the calculus upon which that reasonable suspicion may be determined.[12] *Alvarado*, 423 Mass. at 273.

In this case, the final analysis yields a convergence of supporting factors which place this case on the axis of the *Mercado* and *White* line of cases upholding an investigatory stop and frisk. Applying the factors of analysis employed in those cases establishes that there were present here objective, specific and articulable facts reaching the level of reasonable suspicion that this defendant had been involved in the criminal activity of the shooting in the park, and that, accordingly, the investigatory stop and frisk were constitutionally justified.

The general descriptive characteristics of a man dressed all in black — even though close in color-coordination to the dark navy jacket and the blue jeans the defendant was actually wearing — would not, standing alone, provide distinguishing traces of sufficient particularity to allow for the identification of a suspect. Compare *Commonwealth* v. *Cheek*, 413 Mass. at 496.

---

[12] "Particularly when a police officer receives information concerning an individual with a gun, the 'test for determining reasonable suspicion should include consideration of the possibility of the possession of a gun, and the government's need for prompt investigation.' " *Commonwealth* v. *Stoute*, 422 Mass. 782, 791 (1996), quoting from *United States* v. *Bold*, 19 F.3d 99, 104 (2d Cir. 1994). See *Commonwealth* v. *Mercado*, 422 Mass. at 369-370 (officer's observation revealed that shooting recently occurred, inter alia, added to reasonable suspicion); *Commonwealth* v. *White*, 44 Mass. App. Ct. at 173 (reasonable suspicion determination weighed that "the information on which the police were acting concerned the use of a firearm in a manner to cause serious injury or . . . death"); *Commonwealth* v. *Gunther G.*, 45 Mass. App. Ct. at 119 (unprovoked flight, in case involving use of firearm, "tipped the scale of justification . . . giving rise to reasonable suspicion"). Contrast *Commonwealth* v. *Couture*, 407 Mass. 178, 183, cert. denied, 498 U.S. 951 (1990) ("The mere possession of a handgun was not sufficient to give rise to a reasonable suspicion that the defendant was illegally carrying that gun"); *Commonwealth* v. *Alvarado*, 423 Mass. at 270 (without more, "[w]e have nothing here to justify a reasonable suspicion of criminal conduct beyond a report of a concealed weapon").

However, in this case, such less than finite detail was enhanced and rendered much more distinctive and particularized when viewed against a confining and narrowing space and temporal backdrop, which included close physical proximity to the crime scene coupled with closeness in time (indeed, within moments of) the report of shots having been fired. Further adding to the distinguishing particularity was that it was early in the morning hours, the streets were nearly deserted, and the defendant was the only person present in the very narrow zone where the suspect was seen headed and would probably be found. Thus, physical proximity, closeness in time, and apprehension in a narrow geographic zone added to the matching of the defendant back to the point of origin of the criminal activity in the park supplemented the less distinct physical description.[13]

Lastly, we address the point of danger. Beyond question, the officers knew that the suspect being pursued was carrying a gun just fired in a public park. The danger was palpable and real, prompting a worried message from a compatriot, "Bobby, be careful," a warning predicated on information indicating that the armed men were likely heading towards Young's zone. Given that danger, the frisk immediately undertaken was not only " 'strictly tied to and justified by' the circumstances which rendered its initiation permissible," *Commonwealth* v. *Silva*, 366 Mass. at 407, quoting from *Terry* v. *Ohio*, 392 U.S. 1, 19 (1968), but also "[t]he conscientious officer . . . [did not] hesitate in order to ponder [because] . . . [t]hat moment's hesitation may cost him his life." *Commonwealth* v. *Gonsalves*, 429 Mass. 658, 680 (1999) (Fried, J., dissenting).

The denial of the motion to suppress, which is the sole issue presented in this appeal from the defendant's convictions, see note 1, *supra*, was correct.

*Judgments affirmed.*

---

[13]The factor that the defendant merely looked over his shoulder and made no furtive gesture does not dispel the weight of the other facts giving rise to reasonable suspicion.