SUPERIOR COURT 
 
 COMMONWEALTH vs. LUIS JOSE ROMERO

 
 Docket:
 2181CR0358
 
 
 Dates:
 November 2, 2022
 
 
 Present:
 David A. Deakin
 
 
 County:
 MIDDLESEX
 

 
 Keywords:
 OMNIBUSMEMORANDUM OF DECISION AND ORDER ON DEFENDANT’S MOTIONS TO SUPPRESS EVIDENCE AND TO SUPPRESS IDENTIFICATION TESTIMONY
 
 

             The defendant, Luis Jose Romero, is charged by indictment with armed robbery (in violation of G. L. c. 265, § 17), kidnapping (in violation of G. L. c. 265, § 26), assault by means of a dangerous weapon (in violation of G. L. c. 265, § 15B), carrying a firearm without a license (in violation of G. L. c. 269, § 10(a)), and assault and battery (in violation of G. L. c. 265, § 13A(a)) in connection with an armed robbery that allegedly occurred at night on December 1, 2020. Romero brought a Motion to Suppress Evidence (Paper No. 10) and a Motion to Suppress Identification Testimony (Paper No. 11). He claims that the Everett Police patrolman who stopped him minutes after the robbery as he walked on a street nearby did so without any reasonable articulable suspicion and that the ensuing showup identification was impermissibly suggestive. Romero, therefore, seeks to suppress any evidence seized from him, any statements that he allegedly made, and any identification of him by the victim named in the indictment, Luis M. Pagan-Gomez. Because I conclude that Officer Michael Mori, who initially stopped Romero, had a reasonable articulable suspicion that he was involved in the abduction of Pagan-Gomez and that the ensuing showup identification – although undoubtedly suggestive – was not
 
                                                            -1-
 
impermissibly so, the Motion to Suppress Evidence and the Motion to Suppress Identification Testimony are DENIED.[1]
BACKGROUND[2]
            At approximately 10:00 p.m. on Tuesday, December 1, 2020, two men accosted Luis M. Pagan-Gomez in the lobby of the Pioneer Residences (“Residences”) at 1760 Revere Beach Boulevard in Everett, where Pagan-Gomez lived. The Residences are a large, multi-unit apartment complex. The taller of the two men pressed a handgun against Pagan-Gomez’s side and demanded his belongings. The men took his keys, wallet, and cell phone. They then walked Pagan-Gomez outside to his car, which they searched. The men then demanded to know where his watch and cash were. Pagan-Gomez later told police that he owned a watch worth between $20,000 and $25,000. The men directed Pagan-Gomez back toward the entrance to the building and demanded that he tell them which unit was his. They told him that they intended to take him to his apartment so that he could hand over his watch and cash. As they did this, one of the men pulled Pagan-Gomez’s wrists together in front of him while the other attempted to tape them together with duct tape.
            At this point, Pagan-Gomez resisted. He attempted to take the handgun from the taller of the two assailants. During the struggle, the gun discharged. Eventually, Pagan-Gomez was able to take the gun from his assailant, and, when he did, the two men fled. Pagan-Gomez went to a
 
--------------------------------------------
 
[1] At the hearing on the motions, the parties and I agreed that the record before me does not allow me to address whether the victim should be permitted to make an in-court identification. I, therefore, do not address that issue, preferring instead to defer it for resolution by the trial judge.
[2] The factual allegations about the assault itself are taken from the testimony of Officer Nicholas Basteri. He testified to the victim’s allegations as recounted to him in the immediate aftermath of the events. The summary of the investigation is taken from the testimony of the Everett Police officers who testified – Michael Mori, Lyana Batista, and Nicholas Basteri – all of whose testimony I credit fully.
 
                                                            -2-
 
nearby apartment and borrowed a cellular telephone to call the police. Everett Police Officer Nicholas Basteri arrived minutes later. Pagan-Gomez met him just inside the front entrance to the Residences. Pagan-Gomez immediately told Basteri that he had a handgun – which he had taken from one of his assailants – in his pocket. Basteri secured the gun and took a statement from Pagan-Gomez.
            Pagan-Gomez described the men who had assaulted him as Hispanic. He told Basteri that the man from whom he had wrestled the gun was approximately 6’ 3” tall, weighed roughly 250 pounds, and was wearing a purple jumpsuit. Pagan-Gomez described the other man as approximately 5’ 11” tall, also approximately 250 pounds, and wearing a red jacket. Basteri called the Everett Police dispatcher, provided the descriptions, and asked the dispatcher to advise other officers to be on the lookout for individuals matching those descriptions.
            Minutes later, Everett Police Officer Michael Mori, who was patrolling in the area, saw a man – subsequently identified as Romero – walking hurriedly along Second Street, roughly two- and-one-half blocks from the entrance to the Residences. Romero attracted Mori’s attention for several reasons: (1) Mori had been told in a radio dispatch that at least one of the assailants had “fled the area of Second Street;” (2) Romero was the only person out on the street in the vicinity of the Residences; (3) he was walking hurriedly away from the Residences, in the direction of Chelsea; (4) he was wearing only shorts and a t-shirt on December 1; and (5) he “generally matched the height of [the shorter of the two] . . . perpetrators.” At some point – either just before or just after Mori approached Romero – Mori heard a transmission over the radio from Officer Fitzpatrick, whose first name does not appear in the record. Officer Fitzpatrick reported that he had just approached three people who had left the nearby Stop & Shop grocery store and gotten into an automobile. Fitzpatrick reported that the man in the front passenger seat of the
 
                                                            -3-
 
automobile told him that he had just been on Facetime with a friend of his who was injured and walking on Second Street in Everett.
            Officer Mori, who was patrolling in his personal car because of a shortage of cruisers in Everett (resulting from the COVID-19 (Coronavirus) pandemic) pulled ahead of Romero on Second Street. He stopped his car, got out, and walked back in Romero’s direction. Mori explained that he was a police officer and wanted to talk to Romero. As Officer Mori approached Romero, he could see that his hand was injured. Another officer, Lyana Batista, arrived moments after Mori. She noted that Romero was out of breath and had what appeared to be blood on his hands. When Batista arrived, Mori pat-frisked Romero and detected no weapons or anything else of significance to the investigation. Mori asked Romero some basic questions, including where he was coming from. Romero answered that he was coming from a friend’s home but could or would not provide any more details. During the conversation, Mori radioed that he had stopped a potential suspect on Second Street.
            At this point, officers – including Basteri – agreed that they should conduct a showup identification. Mori and Batista stayed on Second Street with Romero while Basteri brought Pagan-Gomez there in his cruiser. Before leaving the Residences, Basteri told Pagan-Gomez that a potential suspect had been stopped; he asked Pagan-Gomez if he would be willing to go and look at the person to see if he recognized him. Pagan-Gomez agreed, and he and Basteri got into the cruiser. Before leaving, Basteri read Pagan-Gomez an advisory from a printed card. See Exhibit 2. The advisory provided:
You are going to be asked to view some people.
* The person you saw may or may not be among the people you are about to view.
* It is just as important to clear innocent persons from suspicion as it is to identify the guilty.
                                                            -4-
 
* Regardless of whether you identify someone, we will continue to investigate the incident.
* If you identify someone, I will ask you to state, in your own words, how certain you are.
* If you do select someone, please do not ask us questions about the person you have selected, because we cannot share that information with you at this time.
* Regardless of whether you select a person, please do not discuss the procedure with any other witnesses in the case or the media.
* Do you have any questions before we begin?
Id. Basteri then drove Pagan-Gomez to where Romero had been detained, a drive that took under one minute.
            When Basteri and Pagan-Gomez arrived at Second Street, Romero was standing on the sidewalk, with Officers Basteri and Mori – both in full uniform – close by on either side of him. At least one officer was illuminating the three with a flashlight, and, when Basteri pulled up, he activated a bright light on the driver’s side of his cruiser, effectively spotlighting Romero and, to some extent, Basteri and Mori on either side of him. Seated in the back seat directly behind Basteri, Pagan-Gomez indicated that Romero was one of the men who had assaulted him. Again reading from the printed card, Basteri asked him, “[w]ithout using a numerical scale, how certain are you?” Pagan-Gomez answered that he was “more than reasonably certain” of his identification. Basteri then took Pagan-Gomez to the Everett police station, where he filled out paperwork. Romero was arrested and transported to the station for processing.
            The grand jury returned the indictment in this case on September 2, 2021, and Romero was arraigned in this court on September 23, 2021. Romero filed these motions, with supporting materials, on January 28, 2022. I convened a hearing on the motions on August 2, 2022, and took them under advisement.
 
                                                            -5-
 
ANALYSIS
I. The Stop
            The Fourth Amendment to the United States Constitution protects “the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and
seizures.” U.S. Const. amend. IV. Article 14 of the Massachusetts Declaration of Rights similarly provides that “[e]very subject has a right to be secure from all unreasonable searches, and seizures, of his person, his houses, his papers and all his possessions.”
            “Not every encounter between a law enforcement official and a member of the public constitutes an intrusion of constitutional dimensions that requires justification.” Commonwealth v. Narcisse, 457 Mass. 1, 5 (2010), quoting Commonwealth v. Gomes, 453 Mass. 506, 510 (2009). Police officers may approach citizens and question them “without implicating the balance between State power and individual freedom.” Id. (citations omitted). “‘The particular character of such an encounter will determine’ what level of justification, if any, is required.” Id., citing Commonwealth v. Lyles, 453 Mass. 811, 814 (2009).
            If an individual’s encounter with police amounts to more than a minimally intrusive interaction, a seizure occurs. See Commonwealth v. DePeiza, 449 Mass. 367, 369 (2007) (“A person is seized by the police only when, in light of all the attending circumstances, a reasonable person in that situation would not feel free to leave.”), citing Commonwealth v. Stoute, 422 Mass. 782, 789 (1996). Such a seizure can be a Terry stop, requiring reasonable articulable suspicion to believe that the individual is, or recently has been, involved in criminal activity, see Commonwealth v. Ford, 100 Mass. App. Ct. 712, 714-715 (2022); Commonwealth v. Bostock, 450 Mass. 616, 619 (2008), or an arrest requiring probable cause. See Commonwealth v.
 
                                                            -6-
 
Hernandez, 448 Mass. 711, 716 (2007). See also United States v. Ford, 548 F.3d 1, 4 (1st Cir. 2008).
            A seizure, in the constitutional sense, occurs when, “‘in view of all the circumstances surrounding the incident,’ those circumstances were ‘sufficiently intimidating that a reasonable person’” would not feel free to turn away from the police officers and “walk away.” Commonwealth v. Evans, 87 Mass. App. Ct. 687, 690 (2015). See Commonwealth v. Evelyn, 485 Mass. 691, 696-697 (2020) (“Under art. 14, a seizure occurs when an officer, ‘through words or conduct, objectively communicates that the officer would use his or her police power to coerce an individual to stay.’”), quoting Matta, 483 Mass. at 362. The standard is an objective one. See id.
            Police officers may stop a person for investigation if the information known to them gives rise to a “‘reasonable suspicion’ that the person has committed, is committing, or is about to commit a crime.” Ford, 100 Mass. App. Ct. at 715. See also Commonwealth v. Costa, 448 Mass. 510, 514 (2007). Reasonable suspicion requires less than probable cause to arrest, Commonwealth v. Anderson, 461 Mass. 616, 622 (2012), “but must be based on specific, articulable facts and reasonable inferences therefrom rather than on a hunch.” Commonwealth v. Lyons, 409 Mass. 16, 19 (1990), quoting Commonwealth v. Wrenn, 391 Mass. 705, 707 (1984). Even “seemingly innocent activities, taken together, can give rise to reasonable suspicion justifying a threshold inquiry,” and police officers examine these activities through the lens of their training and experience in the field. Commonwealth v. Grandison, 433 Mass. 135, 139 (2001). Nevertheless, “the officers must have entertained rationally ‘more than a suspicion of criminal involvement, something definite and substantial . . . .’” Commonwealth v. Rivera, 27 Mass. App. Ct. 41, 45 (1989), quoting Commonwealth v. Bond, 375 Mass. 201, 210 (1978).
 
                                                            -7-
 
            In determining whether a description of a suspect is sufficiently specific to give police a reasonable articulable suspicion that the individual in question was involved in a crime, a court should consider: “(1) the particularity of the descriptive characteristics which distinguish the suspect from other individuals; (2) the population of individuals in the area at the relevant time for which the distinguishing characteristics must serve as a separator for purposes of identifying the suspect; (3) the physical proximity between the place of the reported criminal activity and the place of the investigatory stop; (4) the length of time between the reported criminal activity and the investigatory stop, as well as the temporal setting within which the criminal event occurs (for example, in the very late night or very early morning hours); (5) the actions of the suspect upon the initial police encounter, including evasive or unusual behavior, which includes, but is not limited to, furtive gestures; (6) whether there is independent police corroboration of the report of the criminal activity; (7) the geographic boundaries where the suspect may reasonably be expected to be found; and (8) the characteristics of the place of the suspected criminal activity (including whether it is a high crime area – a debated determinant).” Commonwealth v. Doocey, 56 Mass. App. Ct. 550, 554-555 (2002) (parentheses in original) (citations omitted).
            The first step in the inquiry is to determine at what point, specifically, Romero was seized, in the constitutional sense. Initially, I conclude that Romero was not seized by Officer Mori’s mere approach and request to speak with him. See Narcisse, 457 Mass. at 5-6 (“law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or another public place”), quoting, inter alia, Florida v. Bostick, 501 U.S. 429, 434 (1991). See also Lyles, 453 Mass. at 815. As he approached Romero, Mori, who was in uniform, identified himself as a police officer and told Romero that he wanted to talk to him.
 
                                                            -8-
 
            In this respect, this case is very similar to the situation in Commonwealth v. Barnes, 451 Mass. 608, 610-614 (2008). In Barnes, an officer in uniform and a marked cruiser stopped the cruiser and motioned to the defendant – who was riding a bicycle – “to come to him.” 451 Mass. at 609. The officer then asked the defendant, “[c]an I speak with you.” Id. The Supreme Judicial Court upheld the conclusion of the motion judge that there was no evidence that the officer issued an order such that the defendant would not have felt free to leave. The SJC observed that, “[i]n numerous cases with facts similar to those presently before us, we consistently have held no seizure was effected by a request to speak with a citizen.” Id. at 614, citing Commonwealth v. Barros, 435 Mass. 171, 172-173 (2001); DePeiza, 449 Mass. at 369; Commonwealth v. Rock, 429 Mass. 609, 610-611 (1999); Commonwealth v. Gunther G., 45 Mass. App. Ct. 116, 117 (1998). There is nothing in this case to suggest that, when Officer Mori approached Romero and told him that he “wanted to speak with him,” he issued an order of the type that would take this case out of the holding in Barnes and the cases cited therein.
            Romero was seized, however, when the officers told him that he would be held for a showup identification procedure and pat-frisked him. The order in which these two events took place is not entirely clear. In that sense, this case presents a circumstance like the one in Narcisse, in which the stop (in the constitutional sense) and the pat-frisk were essentially contemporaneous. 457 Mass. at 7 (“the pat-down of the defendant was not preceded by a forcible stop”). It is not necessary, however, for me to determine whether officers told Romero before or after pat-frisking him that he was being held for a showup identification. That is because the information that the officers had before either event occurred was sufficient to establish the reasonableness of their suspicion that Romero was one of the men who abducted Pagan-Gomez.
 
                                                            -9-
 
            As he first approached Romero, Officer Miro knew that Pagan-Gomez recently had been abducted by two Latino males. Officer Miro knew that Pagan-Gomez had reported that one of his assailants was 6’ 3” tall and the other 5’ 11”; Pagan-Gomez estimated both men’s weight at approximately 250 pounds. Romero was walking on Second Street in Everett, in the direction in which at least one of the assailants reportedly had fled, and he was roughly two-and-one-half blocks away from where the assault had taken place roughly twenty minutes earlier. Finally, although the incident took place in December, Romero was wearing only a t-shirt and shorts, which struck Mori as odd. Further, as he approached Romero, Officer Mori noted that he was out of breath and had an injury to his hand. When Officer Mori questioned Romero, he either could not or would not tell the officer where he was coming from.
            Virtually all the factors that courts use in determining whether a description of a suspect was sufficient to give police a reasonable articulable basis to suspect an individual of involvement in criminal activity point to the reasonableness of Officer Mori’s suspicion that Romero was one of Pagan-Gomez’s abductors. Although the description of the suspects of which Officer Mori was aware was not particularly specific, Romero “generally matched the height,” and, inferentially, the weight of the shorter suspect. Moreover, although Romero was not wearing clothing that matched the description of the suspect’s clothing, Mori noted that it was unusual for Romero to be wearing only shorts and a t-shirt in December. Mori, therefore, was justified in suspecting that Mori recently might have removed a layer of clothing to avoid detection.
            Moreover, Romero was the only person on the street in the aftermath, and vicinity, of the abduction. This fact both provided Mori with a basis for reasonable suspicion and also reduced the significance of the rather non-specific description of the suspects. See Commonwealth v.
 
                                                            -10-
 
Jones, 95 Mass. App. Ct. 641, 646 (2019) (“A description of a perpetrator sought by police ‘need not be so particularized as to fit only a single person, but it cannot be so general that it would
include a large number of people in the area where the stop occurs.’”), quoting Commonwealth v. DePina, 456 Mass. 238, 245-246 (2010); see also Commonwealth v. Mercado, 422 Mass. 367, 371 (1996) (although, individually, “evasive behavior, proximity to a crime scene, [and] . . . matching a general description” not sufficient to establish reasonable suspicion, taken together, they may “allow the police to narrow the range of suspects to particular individuals”).
            Roughly twenty minutes after the crime and well after 10:00 p.m., Officer Mori found Romero on the otherwise empty street, two-and-one-half blocks away from the scene. See Jones, 95 Mass. App. Ct. at 647, citing Doocey, 56 Mass. App. Ct. at 554-555 (“Temporal and geographic proximity to the crime can contribute to the reasonableness of a stop.”). Romero was walking quickly and was out of breath. He had an injury to his hand and was evasive when Officer Mori asked him where he was coming from. Each of these factors supports a finding that Mori’s suspicion that Romero was one of the assailants was reasonable. Finally, there was independent police corroboration of the reported abduction, and Romero was found well within the geographic area where police expected to find the suspects.
            In sum, almost all the factors that can contribute to a finding that a description of a suspect renders reasonable a police officer’s suspicion that then individual was involved in recent criminal activity supported Officer Mori’s conclusion that Romero was one of the suspects in Pagan-Gomez’s abduction minutes earlier. To the extent that Romero’s argument boils down to a claim that the description of the alleged abductors was insufficiently specific to form the basis for a reasonable articulable suspicion that Romero was one of them, it fails
 
                                                            -11-
 
because of the presence of the other factors that, taken together, render Mori’s suspicion reasonable.
            Finally, even if I were to conclude that Romero was seized as soon as Officer Mori approached and asked to speak with him, I would nevertheless conclude that the information Officer Mori had at that point established a reasonable basis to suspect Romero of involvement in Pagan-Gomez’s abduction. It is not clear that, when he first approached Romero, Officer Mori had observed that Romero was out of breath or had injured his hand. Likewise, of course, Officer Mori could not have known as he approached Romero that he would be evasive in response to questions about his recent whereabouts. Even absent that information, however, Officer Mori’s knowledge of the very recent abduction, Romero’s proximity to it, his consistency with the (concededly broad) description of one of the perpetrators, the absence of any other individuals in the area, and his unseasonal attire render reasonable Mori’s suspicion that Romero had been involved in the recent abduction. There is, therefore, no basis for suppression of any evidence derived from Romero’s stop and ultimate arrest.
II. The Showup Identification Procedure
            Although showup identification procedures generally are “disfavored as inherently suggestive, a showup identification conducted in the immediate aftermath of a crime is not necessarily impermissible.” Commonwealth v. German, 483 Mass. 553, 558 (2019), citing Commonwealth v. Dew, 478 Mass. 304, 306 (2017). That such an identification procedure is suggestive is not, standing alone, sufficient to warrant suppression of the resulting identification. Id., citing Commonwealth v. Crayton, 470 Mass. 228, 235 (2014). Rather, “[i]n order for the results of a showup identification to be excluded, a defendant is required to prove, by a preponderance of the evidence, that the showup was so unnecessarily suggestive and conducive 
 
                                                            -12-
 
to irreparable mistaken identification as to deny [the defendant] due process of the law     ” Commonwealth v. Travis, 100 Mass. App. Ct. 607, 613 (2022), quoting Dew, 478 Mass. at 306-307.
            Romero has not met that burden in this case. He has surely established that the showup identification procedure that resulted in his identification was suggestive. All three officers who testified in this case recalled that Pagan-Gomez was shown Romero flanked closely on either side by uniformed police officers – Mori and Batista. No one else was nearby. Under the circumstances, Pagan-Gomez hardly could have been confused as to whom the police had stopped in connection with the case.
            As the cases establish, however, mere suggestiveness is insufficient to warrant suppression. This is likely because, to one degree or another, all showup identifications involve significantly suggestive elements. See German, 483 Mass. at 557 (showup identifications “inherently suggestive”), citing Dew, 478 Mass. at 306. If, therefore, mere suggestiveness were sufficient to warrant suppression, showup identifications would not be merely disfavored, they would be categorically prohibited. The benefits of showup identifications – conducted in appropriate circumstances – would thus be lost. As the Supreme Judicial Court observed in German, “[t]here may be good reason for police to conduct a showup identification, notwithstanding its inherent suggestiveness, due to ‘the nature of the crime involved and corresponding concerns for public safety; the need for efficient police investigation in the immediate aftermath of a crime; and the usefulness of prompt confirmation of the accuracy of investigatory information, which, if in error, will release the police quickly to follow another
track.’” 483 Mass. at 558, quoting Commonwealth v. Austin, 421 Mass. 357, 362 (1995). It is doubtless for this reason that the caselaw has evolved to require defendants to demonstrate by a
 
                                                            -13-
 
preponderance of the evidence that the suggestiveness was such that it created a significant risk of mistaken identification and thus deprived the defendant of due process of law.
            Defendants challenging showup identifications as unnecessarily suggestive may do so in two ways: by challenging the necessity of a showup identification, id., citing Austin, 421 Mass. at 362, and by identifying “special elements of unfairness.” Id., citing Crayton, 470 Mass. at 236. Romero does not challenge the necessity of the showup identification; instead, his challenge is limited to his claims that the circumstances in which it was conducted rendered it unduly suggestive.
            That police were investigating a gunpoint abduction minutes earlier establishes good cause to conduct a showup identification. The situation in this case is similar to that in Travis, 100 Mass. App. Ct. 607, in which police were investigating a very recent armed carjacking and in which the Massachusetts Appeals Court concluded that a showup identification therefore was warranted. In Travis, the Appeals Court held that three “factors are relevant to the inquiry whether good reason [to conduct a showup identification] exists: ‘[1] the nature of the crime involved and corresponding concerns for public safety; [2] the need for efficient police investigation in the immediate aftermath of a crime; and [3] the usefulness of prompt confirmation of the accuracy of investigatory information, which, if in error, will release the police quickly to follow another track.’” 100 Mass. App. Ct. at 613 (initial brackets added; subsequent brackets in original), quoting Austin, 421 Mass. at 362. The same factors justify the showup identification in this case.
            Romero’s argument that the showup identification was unduly suggestive focuses on the circumstances of the identification itself and Detective Basteri’s initial statement to Pagan- Gomez about the identification procedure. Romero argues that – flanked, as he was, by two
 
                                                            -14-
 
uniformed officers and effectively spot-lit by at least one other officer’s flashlight and lights from Basteri’s police cruiser – Romero’s identity as the suspect was readily apparent. Nothing about this procedure, however, distinguishes it from a typical showup identification. Specifically, Romero has not pointed to any circumstance attendant to the procedure that involved “special elements of unfairness, indicating a desire on the part of the police to ‘stack the deck’ against the defendant.” Dew, 478 Mass. at 307. Indeed, it is difficult to imagine how the police might have conducted a showup identification that was significantly less suggestive.
            Romero also points to Detective Basteri’s initial statement to Pagan-Gomez about the identification procedure as additional evidence of undue suggestiveness warranting suppression. Detective Basteri testified, credibly, that, upon deciding to conduct the showup identification, he told Pagan-Gomez that a potential suspect had been stopped and that Basteri wanted Pagan- Gomez to see if he recognized him. That Basteri told Romero that he would be asked to view “a potential suspect” does not render the showup identification impermissibly suggestive. See Travis, 100 Mass. App. Ct. at 615 (“[A] showup identification is not necessarily rendered impermissibly suggestive because the police advise an eyewitness that she is going to view a suspect.”); see also Commonwealth v. Meas, 467 Mass. at 434, 442 (2014) (same).
            Further, Basteri followed up his initial statement to Pagan-Gomez about the showup identification by reading him a balanced advisory about the identification procedure, as required by the Supreme Judicial Court in German, 483 Mass. at 564.[3] This at least partially offset any suggestive impact of his initial statement. See Meas, 467 Mass. at 443 (“[A]lthough there had been a statement to [the witness] expressing the conclusion of police that the shooter was
 
--------------------------------------------
 
[3] The advisory that Officer Basteri read Romero included, virtually verbatim, the elements required by the Supreme Judicial Court in German, 483 Mass. at 564, as well as additional warnings. It was thus fully compliant with the mandate in German.
 
                                                            -15-
 
probably among those that the witness was about to observe, that remark was tempered by other advisements that had been provided to him.”). Thus, neither the circumstances of the showup
identification nor Basteri’s statements to Pagan-Gomez about the identification procedure present “special elements of unfairness,” Austin, 421 Mass. at 362, warranting suppression of the identification.
III.  The Defendant’s Statements to Police
            Romero makes no independent argument for suppression of statements he made to police. Rather, his position is that any such statements must be suppressed because Officer’s Mori’s stop of him was unconstitutional. Because I have concluded that the stop was permissible, there is no basis to suppress any statements Romero made to the police during or after the stop.
CONCLUSION AND ORDER
            For the foregoing reasons, the defendant’s Motion to Suppress Evidence and Motion to Suppress Identification Testimony are DENIED.
Date: 
/s/David A. Deakin
Associate Justice
November 2, 2022