COMMONWEALTH *vs.* MICHAEL CASO & another[1]
(and a companion case).

Suffolk. November 7, 1978. — February 6, 1979.

Present: HENNESSEY, C.J., QUIRICO, KAPLAN, WILKINS, & ABRAMS, JJ.

*Constitutional Law*, Search and seizure. *Search and Seizure*, Wiretap. *Evidence*, Result of illegal search.

Whether testimony of a Commonwealth witness discovered as a result of an illegal wiretap was admissible at a criminal trial depended not only on the flagrance of official misconduct but also on the voluntariness of the witness's decision to testify. [239-244]

TWO INDICTMENTS found and returned in the Superior Court on September 19, 1975, and February 19, 1976, respectively.

Motions to suppress evidence were allowed by *Linscott*, J.

The cases were reported by *Braucher*, J., following his allowance of the Commonwealth's application for an interlocutory appeal in the Supreme Judicial Court for the county of Suffolk.

*Roger A. Emanuelson*, Special Assistant District Attorney, for the Commonwealth.

*Jeffrey Moxon (Willie J. Davis* with him) for the defendants.

QUIRICO, J. After being convicted of conspiracy to commit larceny and conspiracy to utter and publish forged instruments, the defendants were granted a new trial, with the agreement of the Commonwealth, when it was discovered that the wiretap warrant which had uncovered much of the evidence that led to their convictions

---

[1] Kevin Doyle.

was illegal. Prior to their retrial, the defendants moved to suppress all the evidence obtained as a result of that illegal wiretap, including the testimony of a Commonwealth witness discovered only as a result of it. The judge, after a hearing, granted their motion. The Commonwealth concedes that the wiretap was "unconstitutional" and has stipulated that it will not use any conversations intercepted therefrom against the defendants when they are tried again, but argues on this interlocutory appeal that the testimony of the witness should not be suppressed. We hold that the admission of the testimony hinges on the voluntariness with which it was given, and remand the cases to the Superior Court for further findings on that point.

The present controversy had its origins in a joint investigation in the spring of 1975 by the Federal Drug Enforcement Agency (DEA) and the district attorney's office for the county of Suffolk concerning cocaine distribution in the Boston area. In connection with that investigation, a warrant was issued on May 16, 1975, authorizing the wiretapping of the telephone of the defendant Michael Caso. This warrant was based on an affidavit prepared by one Wayne A. Ambrose, Jr., a special agent of the DEA.

The telephone conversations overheard as a result of this wiretap revealed that Caso, defendant Kevin Doyle, and a person known only as "Ted" were parties to a conspiracy to commit larceny from a bank by the use of worthless checks. A search of telephone company records disclosed that the telephone number at which "Ted" was reached was listed to 64 Priscilla Lane in Falmouth, on Cape Cod.

On June 10, 1975, Federal agents and State police officers went to Caso's home to arrest him on a warrant for conspiracy to distribute cocaine. Caso's wife told the officers that he had gone to the Cape. Remembering the Falmouth address that had turned up in connection with the wiretap, several agents decided to go look for Caso there. After being admitted by "Ted," or Edward F. Cur-

ry, Jr., the agents searched the Priscilla Lane house. They did not find Caso, but they did see a checkbook and deposit slips in the name of "Eaton" on a shelf. They showed these to Curry and gave him Miranda warnings. He waived the rights covered by the warnings, and signed a form consenting to the search of his premises.

The agents then telephoned the district attorney's office in Boston to ask if they should arrest Curry. They were told not to, and a representative of the district attorney spoke directly to Curry on the telephone, urging him to come to Boston to tell what he knew about the case. Curry hesitated, wanting to consult an attorney first. He was told to do so and then come to Boston. A week or so later he did go to the district attorney's office with his lawyer, and, after talking both to the district attorney and to his lawyer, he decided to cooperate with the authorities. He gave a statement about check passing schemes which implicated Caso and Doyle, and later testified before the grand jury.

The grand jury returned one indictment charging Caso, Doyle, and Curry with conspiracy to commit larceny in excess of one hundred dollars and another charging Caso and Doyle with conspiracy to utter and publish forged instruments. (Curry was named as an unindicted coconspirator on the latter indictment.) On October 7, 1976, Caso and Doyle were convicted of both crimes and sentenced to consecutive four to five year terms at the Massachusetts Correctional Institution, Walpole. The Commonwealth's evidence against the defendants at trial consisted primarily of Curry's testimony, corroborated by tape recordings from the wiretap of Caso's telephone.

Subsequent to this trial, Special Agent Ambrose of the DEA, on whose affidavit the original wiretap warrant was based, was arrested, and an investigation of his activities as an agent commenced. On February 2, 1977, the Federal government informed counsel for Caso and Doyle that the Ambrose affidavit contained misstatements of fact and did not conform to the requirements of the

Fourth Amendment to the United States Constitution.[2] The defendants moved for a new trial, which was granted, the Commonwealth agreeing thereto. The defendants also filed motions to suppress all the evidence obtained as a result of the illegal wiretap, including the testimony of Curry. It is from the granting of this motion, in so far as it relates to Curry's testimony, that the Commonwealth appeals.

The judge who ruled on the motions to suppress found, as stated in his order, that "unfortunately in this case, an agent got a wiretap to which he was absolutely not entitled. He knew it. He has since been arrested. There was no independent source of information concerning the larceny scheme. This deliberate unlawful wiretap is a grave matter. Wiretapping is a very sensitive area of the law and carefully guarded. The connection between the wiretap and Curry's involvement as a defendant and/or witness is intimate. I rule that the flagrance of the unlawful conduct overrides any mitigating factors such as the Miranda warnings, the advice of counsel and the time between the visit by the police to the Falmouth house and when Curry talked. . . . To allow the cases against Doyle and Caso to be built on the testimony of Curry would be a violation of the principles set forth in *Wong Sun* v. *U.S.*, 371 U.S. at 471."

*Wong Sun* v. *United States*, 371 U.S. 471 (1963), is the touchstone for determination of what constitutes "fruit of the poisonous tree," but a very recent United States Supreme Court case, *United States* v. *Ceccolini*, 435 U.S. 268 (1978), released after the date of the suppression order in this case, specifically addresses the question of the "ap-

---

[2] Both parties have argued this case throughout solely on the basis of the unconstitutionality of the Caso wiretap, omitting any reference to the statute governing eavesdropping, wiretapping, and other interception of communications, G. L. c. 272, § 99. Because the possible effects of this statute on the issues at bar have not been raised, briefed, or argued by the parties, we confine our opinion to the constitutional standard applicable under the Fourth Amendment.

plication of the exclusionary rule to live-witness testimony." *Id.* at 276.

In *Ceccolini,* the Court reversed a Court of Appeals decision affirming a District Court order granting the defendant's motion to suppress the testimony of a witness discovered as a result of an illegal search. Even though, like Curry, the witness in *Ceccolini* would not have come to the attention of the government but for the illegal search, the United States Supreme Court held that her later volunteered testimony should be admitted.[3]

The *Ceccolini* opinion explicitly rejects the position urged by the government in that case that testimony of a live witness should always be admissible at trial "no

[3] For purposes of comparison with the case at bar, a brief review of the facts in *Ceccolini* is appropriate. Respondent Ceccolini ran a flower shop, which in 1973 and 1974 was under investigation by the Federal Bureau of Investigation (FBI) as a suspected gambling spot. In December of 1974, Ronald Biro, a local police officer on traffic duty, went into the shop on his break to chat with Lois Hennessey, a friend and shop employee. While there, he noticed an envelope with money sticking out of it lying behind the counter. Without telling Hennessey, he looked inside the envelope and discovered not only money but policy slips. He reported this discovery to a detective who in turn reported it to the FBI, and four months later an FBI agent interviewed Hennessey at her home, asking for any information she might have about Ceccolini's activities. Hennessey, mentioning that she was studying police science in college, said she would be willing to help, and eventually testified before a grand jury that Ceccolini took policy bets at his shop. Although in broad outline these facts correspond to those of the case at bar, there are three significant points of distinction which should be noted. First, in this case the illegal search was a wiretap procured by the deliberate misconduct of a government agent; whereas in *Ceccolini* it was a police officer's on-the-spot investigation of a suspicious envelope. Second, in this case the government had no knowledge at all of Caso's and Doyle's involvement in a larcenous scheme prior to the illegal wiretap; whereas Ceccolini had already been under investigation for involvement in gambling. Third, the witness Curry was an accomplice and potential codefendant of Caso's and Doyle's, whereas Hennessey was merely an employee of Ceccolini's, in no way implicated in the gambling scheme. These differences, taken together, lead to the conclusion that *Ceccolini,* while suggestive of the factors which must be considered by the court in ruling on this case, cannot be conclusively determinative of the result.

matter how close and proximate the connection between it and a violation of the Fourth Amendment." *Id.* at 274-275. Instead, the Court evaluated the relation of the exclusionary rule to live witness testimony in light of the balance between the deterrent purpose of the rule and the public interest in the prosecution of crime. The Court noted the high costs of disqualifying a knowledgeable and willing witness from testifying. In support of its decision to admit testimony of the witness, it pointed to the following five factors: First, that "the testimony given by the witness was an act of her own free will in no way coerced or even induced by official authority"; second, that the illegally seized slips were not used to secure Hennessey's cooperation; third, that a long period of time passed between the illegal search, the initial contact with the witness, and the trial; fourth, that Hennessey's identity and her relationship to Ceccolini were already well-known to investigating authorities before the illegal search; and fifth, that "[a]pplication of the exclusionary rule in this situation could not have the slightest deterrent effect." *Id.* at 279-280. As a whole, the opinion suggests the policy, which we support, that a truly voluntary decision by a witness to testify should not be overridden unless the extreme circumstances of a particular case require the suppression of the testimony as a deterrent to further resort to the unlawful conduct which resulted in the discovery of the witness. See *Commonwealth* v. *Walker,* 370 Mass. 548, 558 n.6, cert. denied, 429 U.S. 943 (1976); *Commonwealth* v. *White (No. 3),* 365 Mass. 312, 315 (1974), cert. denied, 419 U.S. 1111 (1975).

The judge below did not assess the voluntariness of Curry's decision to testify, ruling instead that the flagrance of the police misconduct alone overrode all other factors. While we in no way condone or underestimate the seriousness of Agent Ambrose's misrepresentations in securing the wiretap warrant, we believe that a trial court judge is required to consider not only the degree of misconduct, but also the closeness of the link between

that misconduct and the eventual testimony sought to be suppressed. If the connection is sufficiently attenuated, the testimony must be admitted. In determining this, a judge should, among other factors, consider whether the witness was, overtly or subtly, coerced into testifying by police exploitation of illegal acts or whether, on the contrary, the witness had voluntarily decided to share what he knew with the police and ultimately with the public.

This task is not an easy one. Ever since the United States Supreme Court in *Wong Sun* v. *United States*, 371 U.S. 471, 486 (1963), suggested that a person's statements could be "sufficiently an act of free will to purge the primary taint of the unlawful invasion," courts have been searching for the invisible line that would divide the free from unfree.[4] As this court pointed out in *Commonwealth* v. *White (No. 3), supra* at 315, "the lines of distinction to be drawn have not been clearly defined." Facing a similar question of voluntariness in *Brown* v. *Illinois*, 422 U.S. 590 (1975), the United States Supreme Court disavowed the possibility of any simple test: "The question whether a confession is the product of a free will under *Wong Sun* must be answered on the facts of each case. No single fact

---

[4] A number of courts have wrestled with the problem of when a witness's decision to testify is "sufficiently an act of free will to purge the primary taint." No useful general rules can be derived from a review of these cases, for they are inconsistent and each turns on its particular facts. A comparison of those which find sufficient free will, see, e.g., *United States* v. *Houltin*, 566 F.2d 1027, 1032 (5th Cir.), cert. denied, 439 U.S. 826 (1978); *United States* v. *Beasley*, 485 F.2d 60 (10th Cir. 1973), cert. denied, 416 U.S. 941 (1974); *Brown* v. *United States*, 375 F.2d 310 (D.C. Cir. 1966), cert. denied, 388 U.S. 915 (1967); *Smith* v. *United States*, 324 F.2d 879 (D.C. Cir. 1963), with those that do not, see, e.g., *United States* v. *Karathanos*, 531 F.2d 26 (2d Cir.), cert. denied, 428 U.S. 910 (1976); *Smith* v. *United States*, 344 F.2d 545 (D.C. Cir. 1965); *United States* v. *Tane*, 329 F.2d 848 (2d Cir. 1964), reveals some of the factors to which other courts have looked in making a determination, such as the length of time between discovery of the witness and the decision to testify, the extent of the leverage the government had over the witness as a result of possible prosecution or favorable treatment, and the presence of intervening circumstances.

is dispositive. The workings of the human mind are too complex, and the possibilities of misconduct too diverse, to permit protection of the Fourth Amendment to turn on such a talismanic test." *Id.* at 603. The *Brown* Court suggested several factors which should be considered: the presence or absence of Miranda warnings, the temporal proximity of the illegality and the statements, the presence of intervening circumstances, the purpose and flagrancy of the official misconduct. *Ceccolini* offers another formulation of some relevant factors: whether "[t]he time, place and manner of the initial questioning of the witness [are] such that any statements are truly the product of detached reflection and a desire to be cooperative on the part of the witness." *Ceccolini, supra* at 277. On this record, there are facts indicative of both voluntary and involuntary behavior by Curry. On the one hand, there are the immediate Miranda warnings, the decision not to pressure Curry by mentioning the taped telephone conversations from the wiretap, the willingness to allow Curry to consult with counsel, the appearance of Curry at the district attorney's office in Boston a week or so after the initial questioning, apparently of his own volition. On the other hand, there is Curry's statement that he had no intention to speak to the police or to cease his activities with Caso and Doyle prior to the appearance of the police at his house, the fact that he was confronted with incriminating evidence, and his awareness that he himself was a suspect in the check passing scheme, subject to arrest. Whether or not, considering all the facts, Curry's decision to testify was "sufficiently an act of free will to purge the primary taint" (*Wong Sun, supra* at 486), is a question of fact which we leave on remand to the "learning, good sense, fairness and courage of [the] trial judges." *Nardone* v. *United States*, 308 U.S. 338, 342 (1939). The government will have the "ultimate burden of persuasion to show that its evidence is untainted." *Alderman* v. *United States*, 394 U.S. 165, 183 (1969).

It is impossible to delineate the exact boundaries of the exclusionary rule, particularly as the courts continue to struggle to accommodate both the goals of deterring official misconduct and of eradicating crime. However, it is at least clear that the United States Supreme Court has commanded "that the exclusionary rule should be invoked with much greater reluctance where the claim is based on a causal relationship between a constitutional violation and the discovery of a live witness than when a similar claim is advanced to support suppression of an inanimate object." *United States* v. *Ceccolini, supra* at 280. In light of this mandate, and the other principles discussed in this opinion, we remand these cases to the Superior Court for reconsideration of the motion to suppress and, at the discretion of a judge of that court, to hold a further hearing thereon, to receive further evidence and make different or additional findings on the factual issues involved.

*So ordered.*