NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

18-P-1195                                            Appeals Court

COMMONWEALTH  vs.  MAURICE JONES.

No. 18-P-1195.

Suffolk.     January 10, 2019. - July 22, 2019.

Present:  Wolohojian, Neyman, & Singh, JJ.


Search and Seizure, Protective frisk, Reasonable suspicion,
     Fruits of illegal search, Threshold police inquiry.
     Threshold Police Inquiry.  Constitutional Law, Search and
     seizure, Reasonable suspicion, Admissions and confessions.
     Practice, Criminal, Motion to suppress, Admissions and
     confessions.  Evidence, Admissions and confessions, Result
     of illegal search.


     Indictments found and returned in the Superior Court
Department on June 26, 2013.

     Pretrial motions to suppress evidence were heard by Linda
E. Giles, J.

     An application for leave to prosecute an interlocutory
appeal was allowed by David A. Lowy, J., in the Supreme Judicial
Court for the county of Suffolk, and the appeal was reported by
him to the Appeals Court.


     Ian MacLean, Assistant District Attorney (Julie S. Higgins,
Assistant District Attorney, also present) for the Commonwealth.
     James L. Sultan (Catherine J. Hinton also present) for the
defendant.

WOLOHOJIAN, J.  This interlocutory appeal stems from motions to suppress[1] that the defendant filed in anticipation of his third trial on indictments charging murder in the first degree and other charges relating to the April 17, 2012 fatal shooting of Dinoriss Alston and nonfatal shooting of Ashley Platt.[2]  After conducting an extensive evidentiary hearing,[3] a Superior Court judge allowed[4] the defendant's motions and suppressed statements that the defendant and his mother had made

---

[1] The defendant's initial motion sought to suppress his own statements to police.  After the evidentiary hearing on that motion, the defendant filed a posthearing memorandum seeking to suppress his mother's statements to police.

[2] On June 26, 2013, the defendant was indicted on charges of murder in the first degree, G. L. c. 265, § 1, armed assault with intent to murder, G. L. c. 265, § 18 (b), assault and battery by means of a dangerous weapon, G. L. c. 265, § 15A, and unlawful possession of a firearm, G. L. c. 269, § 10 (a).  The case was first tried in 2014, ending in a mistrial after the jury failed to reach a verdict.  The case was retried in 2015, and a jury convicted the defendant of all charges except for the armed assault with intent to murder.  In 2017, the Supreme Judicial Court vacated the convictions because of irregularities in the jury selection process, and remanded for a new trial.  See Commonwealth v. Jones, 477 Mass. 307 (2017).  The motions that underlie this appeal were filed after that remand and in anticipation of the third trial.

[3] The hearing took place over the course of five days and testimony was received from eight witnesses.

[4] In her initial order the judge suppressed only the defendant's statements during the first encounter and the mother's statements during the second encounter.  However, after the defendant moved for reconsideration, the judge amended the order and suppressed the defendant's statements during the third encounter as well.  This appeal is from the motion judge's amended memorandum and order.

during three encounters with police on the day of the shooting. The first encounter occurred when police stopped the defendant nearly one-half hour after the shooting to ask him if he knew anything about it. At the beginning of this encounter, the police pat frisked the defendant without reasonable suspicion. The defendant then made certain exculpatory statements, which we conclude the motion judge properly suppressed as fruit of the poisonous tree. See Wong Sun v. United States, 371 U.S. 471, 487-488 (1963). The second encounter occurred minutes later at the defendant's home, where police went to speak with his mother to see if she would confirm what the defendant had just told them. Unlike the motion judge, we conclude that the mother's statements were sufficiently attenuated from the initial illegality that they should not be suppressed as fruit of the poisonous tree. The third encounter occurred later the same day when police, having additional information tying the defendant to the description of the shooter, located him to ask further questions. These statements did not fall within the "cat-out-of-the-bag" doctrine, see Commonwealth v. Mahnke, 368 Mass. 662, 686 (1975), cert. denied, 425 U.S. 959 (1976), as the motion judge concluded, nor was suppression required under the other theories raised by the defendant.

Background.[5]  At around 4 P.M. on April 17, 2012, Dinorris Alston and his girlfriend, Ashley Platt, were sitting in a car parked near a park located between Dunreath and Copeland Streets in the Roxbury section of Boston.  Shots were fired into the car, killing Alston and wounding Platt, who managed nonetheless to drive to a nearby gas station for help.  As she drove from the scene of the shooting, Platt saw a man walking away.

When an officer arrived at the gas station, Platt told him that the shooter was a black male wearing a white T-shirt and khaki pants.  That description was broadcast over police radio at 4:08 P.M.  Hearing that description and a report that shots had been fired, Officer Brian Johnson decided to look for the defendant in order to speak with him.  He knew that the defendant frequented the park and the area where the shooting had occurred, and he had many times before conducted a field interrogation and observation[6] of the defendant in the area of Dunreath and Copeland streets, including the week before.  But

---

[5] We summarize the motion judge's detailed findings, supplementing them with additional uncontroverted facts from testimony the motion judge implicitly credited.  See Commonwealth v. Isaiah I., 448 Mass. 334, 337 (2007), S.C., 450 Mass. 818 (2008).

[6] "A 'field interrogation [and] observation' has been described as an interaction in which a police officer identifies an individual and finds out that person's business for being in a particular area." Commonwealth v. Lyles, 453 Mass. 811, 813 n.6 (2009).

Johnson had never seen the defendant with a gun and did not know him to have any prior firearm convictions.  Moreover, Johnson had never had any problems with the defendant and had no information connecting the defendant to the shooting.  At the time he went looking for the defendant, Johnson was in an unmarked car, and he was wearing plainclothes and his badge.

Johnson located the defendant around 4:25 P.M. about one mile away from Dunreath Street.  The defendant, a young black man, was walking by himself and wearing a white T-shirt with a red and grey graphic design of a winged unicorn on the front bearing the word "Temptation."  He wore khaki cargo-style shorts, a black baseball cap with a small red pony logo on the front, and black sneakers.

Johnson pulled over, got out of his car, and asked the defendant, "What's up?" in a conversational, nonconfrontational manner.  The defendant answered in a calm and natural tone with "[h]ey," or a similar expression.  At this point, Johnson patted down the defendant's waist and pockets but found nothing.  Johnson then asked the defendant casually what he was doing and where he was going.  The defendant replied that he had been at his house earlier and that he was going to meet his mother at Walgreens to add minutes to his cell phone.  Officer Michael Fanning joined Johnson during this conversation, but neither displayed his firearm or attempted to restrain or handcuff the

defendant. The conversation lasted about five minutes in total, and after a brief consultation with his superior officer by telephone, Johnson ended the encounter.

The two officers then immediately went around the corner to the defendant's home, intending to speak to his mother to see if she would verify what the defendant had told them.[7] The officers did not tell her that they had just spoken to the defendant. She denied that she was going to accompany the defendant to Walgreens and said she had not spoken with her son since that morning. She confirmed that the defendant frequented the area where the shooting had taken place.

Meanwhile, Platt gave police a more detailed description of the shooter, which was broadcast: a young black male with khaki shorts, black "Chuck Taylor" sneakers,[8] a white shirt with some red in it, and a black and red baseball cap.[9] Johnson and

---

[7] The mother was not home when the officers arrived but arrived shortly thereafter and spoke with the officers on the porch of her home.

[8] Although the defendant was wearing black sneakers at the time he was observed by officers, they were not Chuck Taylor sneakers.

[9] In two subsequent interviews that day, Platt's description varied slightly. In the first of these interviews, she did not mention any red in the white shirt. In the second, she described the hat as black with a red brim.

Fanning were ordered to look for the defendant again given this new description.

They found him at around 5:30 P.M., wearing the same clothing as before and walking with another man around the corner from his home.  In response to the officers' request, the defendant agreed to wait to speak with detectives, who arrived shortly thereafter and engaged the defendant in a cordial conversation conducted at a normal speaking volume.  The officers did not pat frisk the defendant (who seemed a little nervous, jittery, and excitable), restrain him, display weapons, or make any show of authority.  During this conversation, the defendant said that he had not been in the area of the shooting but instead had been home for the day.  He agreed to have his photograph taken and to submit to a gunshot residue test, but he declined to be transported to the hospital for Platt to view. The defendant ultimately ended the encounter, which lasted between eight and ten minutes.

Discussion.  The Commonwealth argues that the motion judge erred in allowing the defendant's motions to suppress, because (1) reasonable suspicion justified the initial patfrisk of the defendant,[10] (2) even if the frisk was unlawful, the mother's

_____

[10] Although the Commonwealth argued below that the patfrisk did not constitute a seizure of the defendant for constitutional purposes, it does not make this argument on appeal.

later statements were not fruit of the poisonous tree, and (3) the motion judge improperly applied the "cat-out-of-the-bag" doctrine to the defendant's statements during the third encounter.  In reviewing the judge's ruling, we accept the judge's subsidiary findings unless clearly erroneous, see Commonwealth v. White, 374 Mass. 132, 137 (1977), aff'd, 439 U.S. 280 (1978), but make an "independent determination on the correctness of the judge's 'application of constitutional principles to the facts as found,'" Commonwealth v. Haas, 373 Mass. 545, 550 (1977), S.C., 398 Mass. 806 (1986), quoting Brewer v. Williams, 430 U.S. 387, 403 (1977).

1.  First encounter.  "[P]olice officers may not escalate a consensual encounter into a protective frisk absent a reasonable suspicion that an individual has committed, is committing, or is about to commit a criminal offense and is armed and dangerous." Commonwealth v. Narcisse, 457 Mass. 1, 9 (2010).  "That suspicion must be grounded in 'specific, articulable facts and reasonable inferences [drawn] therefrom' rather than on a 'hunch.'"  Commonwealth v. DePeiza, 449 Mass. 367, 371 (2007), quoting Commonwealth v. Scott, 440 Mass. 642, 646 (2004). "[T]he totality of the facts on which the seizure is based must establish 'an individualized suspicion that the person seized by the police is the perpetrator' of the crime under investigation."  Commonwealth v. Meneus, 476 Mass. 231, 235

(2017), quoting Commonwealth v. Warren, 475 Mass. 530, 534 (2016).

For the reasons that we set out below, we are not persuaded by the Commonwealth's argument that the following factors provided reasonable suspicion to pat frisk the defendant: (i) the "match" between the defendant and the initial broadcast description of the shooter, (ii) the defendant's geographic and temporal proximity to the location of the shooting, (iii) the fact that the defendant frequented the area where the shooting occurred, and (iv) the nature of the offense being investigated. We examine each of these factors in turn.

First, when the defendant was pat frisked, the description of the shooter was nonspecific, consisting only of a black male wearing a white T-shirt and khaki pants. A description of a perpetrator sought by police "need not be so particularized as to fit only a single person, but it cannot be so general that it would include a large number of people in the area where the stop occurs." Commonwealth v. Depina, 456 Mass. 238, 245-246 (2010). The description here did not meaningfully narrow the range of possible suspects and, thus, did not substantially contribute to the reasonable suspicion analysis. See Warren, 475 Mass. at 534-537 (no reasonable suspicion where defendant and another individual "matched" description of two black males wearing dark clothing); Commonwealth v. Cheek, 413 Mass. 492,

496 (1992) (description of suspect as "black male with a black 3/4 length goose" jacket not sufficiently particularized to support reasonable suspicion where defendant was one-half mile from the scene of the reported stabbing).

Moreover, to the extent the defendant's "match" to the general description had any value, it was largely offset by the aspects of his appearance tending to exclude him from the description: the defendant wore shorts, not pants, and wore a shirt with a distinctive unicorn graphic that was not mentioned in the initial description. See Meneus, 476 Mass. at 237 (distinctive clothing of defendant not mentioned in description of perpetrator detracted from reasonable suspicion analysis). "Unless the police were able to fortify the bare-bones description of the perpetrator[] with other facts probative of reasonable suspicion, the defendant was entitled to proceed uninhibited" down the street. Warren, 475 Mass. at 536.

Second, the defendant was stopped about one mile away from the scene of the crime, and about twenty-five minutes afterwards, as was the precise case in Commonwealth v. Warren, 475 Mass. at 536. As in Warren, which also involved a crime in the Roxbury section of Boston, we note that "given the nearly thirty-minute time period between [the offense] and the stop . . . , the suspect[] could have traveled on foot within a two

mile radius of the crime scene." Id. at 536-537.[11] Thus, although temporal and geographic proximity to the crime can contribute to the reasonableness of a stop, see Commonwealth v. Doocey, 56 Mass. App. Ct. 550, 554-555 (2002), it was not particularly meaningful here. Indeed, Officer Johnson went to look for the defendant on Cobden Street because he knew it was near the defendant's home, not because it was near the shooting. The defendant's presence on a sidewalk right around the corner from his home on a spring afternoon cannot be said to add much to the reasonable suspicion calculus.

In addition, nothing about the defendant's appearance or behavior at the time of the stop gave any reason to think that he was connected to the crime, fleeing from it, or attempting to conceal himself. Contrast Commonwealth v. Johnson, 88 Mass. App. Ct. 705, 712 (2015) (defendant standing among trees in unlit park that was closed "wearing a hoodie 'tightly' pulled around his face"). He did not engage in any suspicious behavior, and he "did not make any furtive gestures or reach into his pockets in a manner that would suggest that he was carrying a weapon." Commonwealth v. Villagran, 477 Mass. 711,

---

[11] Although no map was included in the record on appeal, in Warren, the court noted that depending on the direction taken from the Roxbury crime scene, various "paths of flight would lead to different Boston neighborhoods, Dorchester or Jamaica Plain, in different areas of the city." Warren, 475 Mass. at 537.

718 (2017). Instead, he was simply walking on a sidewalk near his home.

Third, the fact that the defendant was known by police to frequent the area where the crime took place is of only moderate value where the area in question is a public park about one mile from his home. Although the officers knew that the defendant visited the park frequently, they had nothing connecting him to the crime or to firearms more generally, and "[he] was not known to the officers as someone having previously been arrested for criminal activity." Commonwealth v. Martin, 457 Mass. 14, 21 (2010).

Finally, although we acknowledge that "[t]he gravity of the crime and the present danger of the circumstances may be considered in the reasonable suspicion calculus," Depina, 456 Mass. at 247, and that where, as here, shots have been recently fired, or there is otherwise an imminent threat presented by a gun, "there is an edge added to the calculus upon which that reasonable suspicion may be determined," Doocey, 56 Mass. App. Ct. at 557, the gravity of the crime is not dispositive, see Meneus, 476 Mass. at 239, and cannot compensate for the absence of information connecting the defendant to it.[12]

---

[12] The Commonwealth argues that the motion judge erred in finding that shell casings discovered near the crime scene did not demonstrate that the weapon used in the shooting "likely contained additional unused ammunition." We need not resolve

Thus, the motion judge correctly determined that the patfrisk was not supported by reasonable suspicion that the defendant had committed, was committing, or was about to commit a crime and was armed and dangerous. The motion judge accordingly suppressed as fruit of the poisonous tree the defendant's statements made immediately after the patfrisk during his initial encounter with the police. See Wong Sun, 371 U.S. at 487-488. The Commonwealth did not argue below, and does not now argue on appeal, that the defendant's statements during this first encounter were "sufficiently attenuated from the underlying illegality [of the patfrisk] so as to be purged from its taint."[13] Commonwealth v. Damiano, 444 Mass. 444, 454 (2005). Instead, the Commonwealth argues that the motion judge erred in concluding that the mother's statements were also fruit of the poisonous tree. We turn to that question next.

2. Second encounter. "Evidence obtained by exploiting unlawful police conduct must be suppressed." Commonwealth v. Nickerson, 79 Mass. App. Ct. 642, 649 (2011). Nevertheless, "[e]vidence obtained subsequent to unlawful police conduct does

---

the issue because, even assuming without deciding that the Commonwealth is correct, our analysis would be unchanged.

[13] Accordingly, we do not consider the issue. See Commonwealth v. Bettencourt, 447 Mass. 631, 633 (2006) (arguments not raised below urging reversal of trial court's ruling are generally not considered on appeal).

not automatically become sacred and inaccessible."  Commonwealth v. Fredette, 396 Mass. 455, 459 (1985).  Instead, in each case, we examine "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."  Wong Sun, 371 U.S. at 488.  "To determine whether the connection between the evidence and the improper conduct has become so attenuated as to dissipate the taint, the facts of each case must be examined in light of three factors: the temporal proximity of the [unlawful conduct] to the obtaining of the evidence; the presence of intervening circumstances; and the purpose and flagrancy of the misconduct" (citation and quotation omitted).  Commonwealth v. Lunden, 87 Mass. App. Ct. 823, 826-827 (2015).  See Commonwealth v. Fredericq, 482 Mass. 70, 81-82 (2019); Commonwealth v. Johnson, 58 Mass. App. Ct. 12, 14 (2003).  We examine the first two factors "in conjunction with each other."  Damiano, 444 Mass. at 455.  As to the third factor, "we ask, first, whether the police performed the illegal act for the purpose of obtaining the evidence that the defendant seeks to suppress, and second, whether the police knew that their actions were illegal but proceeded anyway (flagrancy)."  Commonwealth v. Long, 476 Mass. 526, 537-538 (2017).  With these

general principles in hand, we turn to the specifics of the mother's encounter with the police.

Although the record does not reflect the precise amount of time that elapsed between the patfrisk and the officers' conversation with the mother, it appears to have been quite brief. The officers went directly to the defendant's nearby home after their conversation with him, and his mother arrived at the home shortly after the officers. This temporal proximity certainly ties the second encounter to the first, but it alone is not dispositive. See, e.g., Johnson, 58 Mass. App. Ct. at 14 (identification "followed closely" upon illegal stop, but taint extinguished by intervening circumstances); Commonwealth v. Manning, 44 Mass. App. Ct. 695, 698-700 (1998) (taint of illegal arrest dissipated despite short time between arrest and taking of booking photograph, with no intervening circumstances).

Although the second encounter followed on the temporal and geographic heels of the first one, other factors separated them. The officers ended their interaction with the defendant before beginning the encounter with the mother. The mother was not involved in the first encounter. And the officers did not tell the mother anything they learned from the first encounter, or even say that it had occurred. Contrast Fredericq, 482 Mass. at 82 (officer used unlawfully obtained information to obtain defendant's consent to search). These intervening circumstances

contribute to attenuate any connection between the second encounter and the illegal patfrisk. See Commonwealth v. Pearson, 90 Mass. App. Ct. 289, 294 (2016) (temporal attenuation found where following defendant's arrest and transport to police headquarters officers conversed with house owner while securing premises). See also Commonwealth v. Gallant, 381 Mass. 465, 470-471 (1980) (dissipation of taint more likely where statements at issue are those of third-party witness whose constitutional rights were not violated).

As to the third factor, the defendant has made no showing that the purpose of the illegal patfrisk was to obtain the statements later made by the mother, and in fact, logic and the record would undermine such an argument. The defendant is on stronger ground with respect to "flagrancy" in the sense that every officer can be presumed to know that reasonable suspicion is required to conduct a patfrisk. However, as the motion judge reasoned, "the officer's hunch about the defendant being armed, although legally insufficient, was not unfounded," because "in the immediate aftermath of a deadly shooting, the defendant was encountered only about a mile from the scene of the shooting, a park he frequented, and [partially] matched the minimal description of the shooter." Thus, although there is no "'good faith' exception to either the exclusionary rule or the attenuation doctrine," Fredericq, 482 Mass. at 84, we do not see

any error in the judge's conclusion that the patfrisk, although not supported by reasonable suspicion, was not flagrant misconduct in the aftermath of a fatal shooting. "In sum, the third factor of the analysis . . . , which is especially significant because it is tied to the purpose underlying the exclusionary rule, does not favor suppression of the evidence." Commonwealth v. Suters, 90 Mass. App. Ct. 449, 460 (2016).

Although "the exclusionary rule should be invoked with much greater reluctance where the claim [as here] is based on a causal relationship between a constitutional violation and the discovery of a live witness than when a similar claim is advanced to support suppression of an inanimate object," Commonwealth v. Caso, 377 Mass. 236, 244 (1979), quoting United States v. Ceccolini, 435 U.S. 268, 280 (1978), the defendant contends that his mother was "coerced into [providing a statement] by police exploitation of illegal acts." Caso, supra at 242. In general, "a truly voluntary decision by a witness to testify should not be overridden unless the extreme circumstances of a particular case require the suppression of the testimony as a deterrent to further resort to the unlawful conduct which resulted in the discovery of the witness." Id. at 241.

Here, although the officers concealed from the mother that they had already spoken to the defendant, they were otherwise

candid and truthful about the incident they were investigating and its location.  The conversation with the mother took place just outside her home during the afternoon and did not involve any show of police authority, threats, confrontations, or promises.  Nor did the police imply or suggest that the mother had any criminal liability or fault.  In short, the record is essentially devoid of evidence suggesting that the mother's statements were not voluntary.

For these reasons, the mother's statements to officers were sufficiently distinguishable from the defendant's unlawful pat frisk "to be purged of the primary taint."  Wong Sun, 371 U.S. at 488.

3.  Third encounter.  The motion judge suppressed the defendant's statements made during the third encounter under the "cat-out-of-the-bag" theory.  That doctrine suppresses statements made after a Miranda violation, see Miranda v. Arizona, 384 U.S. 436 (1966), because a defendant may believe that, "after a prior coerced statement, his effort to withhold further information would be futile and he [has] nothing to lose by repetition or amplification of the earlier statement[]." Mahnke, 368 Mass. at 686.  We assume for our purposes here -- but expressly do not conclude -- that the defendant's statement made during the first encounter was obtained in violation of his

Miranda rights; nonetheless, the "cat-out-of-the-bag" doctrine does not apply.

The "cat-out-of-the-bag" doctrine does not apply where either "(1) after the illegally obtained statement, there was a break in the stream of events that sufficiently insulated the post-Miranda statement from the tainted one; or (2) the illegally obtained statement did not incriminate the defendant, or, as it is more colloquially put, the cat was not out of the bag." Commonwealth v. Thomas, 469 Mass. 531, 551 (2014), quoting Commonwealth v. Prater, 420 Mass. 569, 580 (1995). The "focus and ultimate goal" of this analysis is "a determination of the voluntariness of the later confession." Thomas, supra, quoting Prater, supra at 581.

Here, there was a substantial break in the stream of events between the defendant's encounters with officers: one hour during which the defendant was not in custody and had no contact with police. More importantly, the defendant's initial statement was not inculpatory. The statement "did not place him at the scene of the crime . . . [and] the fact that the police had no evidence contradicting the initial statement when it was made negates the possibility that it was inculpatory because it evidenced consciousness of guilt." Commonwealth v. Sarourt Nom, 426 Mass. 152, 156 (1997). Contrast Commonwealth v. Smith, 412 Mass. 823, 835-836 (1992) (suppression of second statement

required where police knew defendant's initial statement to be false when made during interrogation).  Accordingly, the motion judge erred in excluding the defendant's statements during the third encounter based on the "cat-out-of-the-bag" theory.

Alternatively, the defendant argues that the motion judge's conclusion may be supported on two other grounds.  See Commonwealth v. Va Meng Joe, 425 Mass. 99, 102 (1997) (appellate court may "affirm a ruling on grounds different from those relied on by the motion judge if the correct or preferred basis for affirmance is supported by the record and the findings"). First, he contends that the third encounter constituted an unlawful seizure without reasonable suspicion.  But the record shows that the officers informed the defendant that detectives wanted to speak with him, and he agreed to wait for them.  A "'request to speak with the defendant and ask questions' . . . does not rise to the level of a seizure." Commonwealth v. Martin, 467 Mass. 291, 303 (2014), quoting Commonwealth v. Nestor N., 67 Mass. App. Ct. 225, 228-229 (2006).  See Commonwealth v. Lopez, 451 Mass. 608, 610, 614 (2008) (officer's request, "Can I speak with you?" not seizure); Commonwealth v. Barros, 435 Mass. 171, 172, 174 (2001) (officer's statement, "Hey you . . . I want to speak with you," not seizure); Commonwealth v. Rock, 429 Mass. 609, 611-612 (1999) (officer's request, "Guys, can I talk to you for a second?" not seizure).

There is no evidence that the tone of any officer involved "was aggressive, that [any] officer physically blocked the defendant from leaving, or that the officers issued any orders or commands to the defendant." Lopez, supra at 612. The defendant was not pat frisked or otherwise searched during the conversation, and he ended the encounter of his own volition, after refusing the officers' request to take him to the hospital for potential identification.

Second, the defendant argues that his statements during the third encounter were the fruit of the initial unlawful patfrisk. We are not persuaded. After the patfrisk, the defendant was at liberty for one hour, during which time officers obtained new reasons to wish to speak with him: Platt's more detailed description of the shooter, the mother's statements contradicting the defendant, and the resulting inference that the defendant's false exculpatory statement during the first encounter reflected consciousness of guilt. These intervening circumstances sufficiently attenuated the third encounter from the first to dissipate any taint.

Conclusion. For these reasons, we reverse so much of the amended order as allows suppression of the mother's statements and the defendant's statements made during his second encounter with the police. In all other respects, the amended order is affirmed.

<u>So ordered</u>.