NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

22-P-335
22-P-409

COMMONWEALTH

vs.

KAITLYN GUARDIONE (and a companion case[1]).

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The defendants bring this interlocutory appeal from the denial of their motions to suppress, arguing that the police lacked reasonable suspicion to conduct the stop of their vehicle, which led to the seizure of drugs and other evidence.[2] The Commonwealth claims (and the motion judge agreed) that the police had reasonable suspicion for the stop where the police knowledge included (1) information from a confidential informant (CI) that the CI had seen the same car repeatedly stopping outside a house in a residential neighborhood of Weymouth over a period of weeks, after which a person would leave the car, go

---

[1] Commonwealth vs. Michael Higuera.
[2] Although the defendants' cases were briefed separately, we heard argument on them together and have paired them for purposes of decision given the common facts and legal issues.

behind the fence of the house and meet with an occupant of the home, and return in approximately thirty seconds, and (2) police surveillance that witnessed some of this behavior -- the car stopping for a brief period outside the home, and in one instance an occupant leaving the car and then quickly returning. At the time of the stop, the police knew nothing material about the car or its occupants, although the police did know the house, as they had been there for drug-related activity in the past.

Ultimately, we agree that on the record established, the motions to suppress should have been granted. Reasonable suspicion to justify a stop is not a high bar, as demonstrated by the seminal case of Terry v. Ohio, 392 U.S. 1 (1968) itself, and this case is accordingly a close one. Here, however, although police surveillance corroborated some of what the CI reported, such that those activities were properly included in the reasonable suspicion calculus, the police were unable to corroborate sufficient details to give rise to reasonable suspicion that the activities in question were criminal -- as opposed to innocent behavior such as periodic home deliveries. The police thus were not justified in stopping the defendants as they were driving away from the home.

Background.[3]  In October 2019, a CI contacted Weymouth police detective Robert Gervasi to report concerns about suspected drug activity.  The CI, who was not previously known to the police, reported seeing a black Ford Taurus (vehicle) with a female driver and male occupant make several brief visits to a Weymouth residence (the property).  The CI explained that either the driver or the occupant would exit the vehicle, go to the backyard of the property, and briefly meet with a resident of the property.  The CI could not see what took place in the backyard, because the CI's view was obstructed by a fence, but hypothesized that the meetings were drug exchanges.  Detective Gervasi, an experienced drug investigator, believed that the details that the CI provided were consistent with drug transactions and began drive-by surveillance of the property.  Detective Gervasi's initial surveillance efforts failed to corroborate the CI's tip.

In January 2020, the CI again contacted Detective Gervasi and expressed that the car stops were "getting active again."  The CI reported seeing the same vehicle park near the property and a male passenger exit, briefly meet with a resident of the property, one Janice Bryant, and then return to the vehicle.

---

[3] We summarize the facts as found by the motion judge and from undisputed testimony at the hearing.  Commonwealth v. Karen K., 491 Mass. 165, 166 (2023).

3

Accordingly, on the evening of January 27, 2020, Detective Gervasi and another detective resumed surveillance of the property. At approximately 5:30 P.M., they saw the vehicle park near the property and a male passenger exit the vehicle, enter the side yard, and then return to the vehicle approximately thirty seconds later. Gervasi, however, could not see what took place in the side yard because it was dark and his view was obstructed by a fence.

Two days later, on January 29, 2019, Detective Gervasi resumed surveillance, together with Detective Sergeant Donnelly and Detectives Galvin and Brennan. Through his rear-view mirror, Detective Galvin saw the vehicle arrive at the property around 5:50 P.M., park, and shut off its lights. Detective Gervasi, stationed separately at a nearby location, saw that the vehicle had a female driver and a male passenger. However, given that it was after dark and the lack of lighting, Detective Galvin was unable to see whether either occupant left the vehicle. About thirty seconds after parking, the vehicle's lights turned back on and the vehicle left. Based on his over twenty years of police experience, Detective Brennan testified that the detectives' observations were "definitely consistent with a street-level transaction."

The detectives followed the vehicle to a nearby intersection, where the vehicle came to a stop at a traffic

4

light.  Three detectives then approached the vehicle on foot, with Detectives Donnelly and Galvin approaching the female driver and Detective Gervasi approaching the male passenger. Detective Donnelly asked the driver for identification, which identified her as the defendant Guardione.  Guardione was thereafter arrested on an outstanding warrant.  Meanwhile, Detective Gervasi asked the male passenger, later identified as the defendant Higuera, to open the passenger-side door.  After Higuera opened the door, Detective Gervasi inquired whether Higuera had any weapons or drugs.  Higuera said that he had "dope" in his pocket and eventually produced a large sandwich bag containing smaller baggies filled with a white powder.  Upon further questioning from Detective Gervasi, Higuera produced another small baggie, also containing a white powder, from his sock.  The detectives arrested Higuera, read him his Miranda warnings, and searched the vehicle.  The search revealed three cell phones, a cut straw, and $648 in cash.

The defendants moved to suppress the evidence, contending that the stop was unsupported by reasonable suspicion of criminal activity.  The judge denied the motions.[4]  Although the judge concluded that standing alone, the CI's tip lacked

---

[4] Higuera also moved to suppress statements that he made to Detective Gervasi.  The judge allowed that portion of Higuera's motion, and it is not before us on appeal.

reliability -- because the CI was unknown to the detectives, did not "observe exactly what occurred during the visits," and "did not claim to have seen drugs being passed" -- the judge concluded that the subsequent police surveillance overcame those deficiencies. The judge also relied on the detectives' knowledge of past overdoses and drug arrests at the property, and the detectives' experience-based opinions that the visits were consistent with drug transactions.

Discussion. The question before us is whether the stop was supported by reasonable suspicion -- more specifically, "whether the stop was based on an officer's reasonable suspicion that the person was committing, had committed, or was about to commit a crime" (citation omitted). Commonwealth v. Warren, 475 Mass. 530, 534 (2016).[5] "That suspicion must be grounded in 'specific, articulable facts and reasonable inferences [drawn] therefrom' rather than on a hunch" (citation omitted). Commonwealth v. DePeiza, 449 Mass. 367, 371 (2007). In our review, "we accept the judge's subsidiary findings of fact absent clear error" but "review independently the application of constitutional

---

[5] Although the parties agree that the defendants were seized, they disagree as to precisely when that seizure occurred. Because the answer to that question does not impact our analysis, we do not address it. It is enough to conclude, as the motion judge found, that Guardione was seized no later than "when the police asked for her license," and that Higuera was seized, "at the latest, when . . . Gervasi asked him to open the door to the" vehicle.

6

principles to the facts found" (citation omitted).  Commonwealth v. Cordero, 477 Mass. 237, 241 (2017).  See Commonwealth v. Buckley, 478 Mass. 861, 864 (2018).

Here, the facts the Commonwealth points to as establishing reasonable suspicion include:  (1) the observations of the CI, including the car repeatedly visiting the property, a person exiting the car, meeting with someone in the yard, and returning to the car in less than one minute, as well as the CI's statement that he believed the visits were for drug transactions; (2) observations of the detectives of similar repeated and brief visits; (3) the detectives' knowledge of the property at issue -- specifically, overdoses that occurred at the property on unspecified dates and a drug arrest that occurred years prior; and (4) police testimony, based on their experience, that the observed conduct was consistent with drug transactions.

Our review is of the "totality of the facts on which the seizure is based."  Commonwealth v. Meneus, 476 Mass. 231, 235 (2017).  Before engaging in that analysis, a threshold question here is the extent to which it was permissible to rely on the CI's tip.  In evaluating that question the case law focuses on the so-called "Aguilar-Spinelli" factors -- that is, what was known about the CI's "basis of knowledge" and "reliability." See Commonwealth v. Lyons, 409 Mass. 16, 19 (1990).

7

Importantly, when we address reasonable suspicion we can consider the CI's tip on "[a] less rigorous showing" than when we address probable cause.  See Lyons, supra at 19.  See also Commonwealth v. Upton, 394 Mass. 363, 375 (1985) (discussing Aguilar-Spinelli test).  Moreover, "[i]ndependent police corroboration may make up for deficiencies in one or both of [the Aguilar-Spinelli] factors."  Lyons, supra.

As noted, the judge here concluded that the CI's tip did not satisfy the Aguilar-Spinelli test, but nonetheless found that the detectives' observations overcame the tip's deficiencies by corroborating the repetitive, brief, and nonvisible nature of the visits.  We agree that the detectives' observations corroborated some of what the CI relayed.  The detectives saw a specific vehicle with a female driver and a male passenger make two separate visits to the property, stop in the same location for about thirty seconds, and shut off its lights.  They also saw, on one occasion, an occupant venture briefly behind a fence.  Those observations corroborated what the CI relayed about repetitive visits, their brevity, and their nonvisible nature.  Those facts are properly considered in the reasonable suspicion analysis.  See Commonwealth v. Dasilva, 66 Mass. App. Ct. 556, 560 n.5 (2006) ("consider[ing] . . . tip for what reliability it may have possessed").

8

The observations of the detectives did not, however, corroborate the CI's expressed suspicion that the defendants were engaged in drug sales. The CI provided no basis for knowing that. The defendants went behind a fence. The CI did not say that he saw drugs, or that he saw an exchange, or even that he saw anything in the defendants' hands, either before or after they went behind the fence. While the CI gave the name of an occupant of the home that the defendants allegedly met with, he did not provide a basis for knowing that either, and the testimony of the detectives indicated that the fence would have obstructed any view of a meeting. In short, the observations of the CI and the detectives established a pattern of behavior -- brief entrances and exits to the yard that occurred periodically -- including, by reasonable inference, that a passenger in the car met with someone from the home. The observations themselves, however, did not supply the basis of knowledge necessary to tie those observations to drugs or other illegal activity.

Indeed, there are notable parallels between this case and Lyons. In Lyons, supra at 17, Massachusetts State Police received an anonymous tip that two white males had recently purchased narcotics in Chelsea and were headed to Maine in a vehicle that the informant identified by make, model, and plate number. A trooper located and stopped the vehicle soon

9

thereafter and found cocaine.  Id. at 17-18.  The Supreme Judicial Court held that the necessary corroboration for the tip was lacking, despite the trooper's validation of "the description of the automobile, the direction in which it was headed, and the race and gender of the occupants."  Id. at 20.  The court reasoned that corroboration of those "obvious details" did not "substitute for explicit information about the basis of the [informant's] knowledge" that the defendants had purchased drugs, where the details about the car and its occupants did not evidence a "special familiarity with the defendants' affairs."  Id. at 20-21.

We turn then to whether the information that the detectives corroborated, in conjunction with their own observations and experiences, supplied the necessary reasonable suspicion that what was observed was criminal activity.  The motion judge answered that question in the affirmative based on the vehicle's "repeated visits to [the property] and its occupants' brief, concealed interactions in the yard"; the detectives' knowledge of past drug activity at the property; and the detectives' "experienced opinion[s]" that these visits were "consistent with drug transactions."  On this record, we do not agree.

We begin with a caveat.  As mentioned above, the analysis must be based on the totality of the known facts, or put differently, on the unique collection of facts of the individual

case.  A decision limited to unique facts, however, gives little guidance for evaluating the next case that comes along.  See generally Ornelas v. United States, 517 U.S. 690, 698 (1996).  Accordingly, in order to give guidance for the future, the case law often (and understandably) examines the known facts in isolation, and attempts to assign them a relative weight.  See, e.g., Commonwealth v. Kearse, 97 Mass. App. Ct. 297, 301-304 (2020).  We employ that same approach herein, while recognizing that in the end, the facts should not be treated in isolation, but rather collectively.  See Commonwealth v. Karen K., 491 Mass. 165, 175 (2023).

With that caveat in mind, we note first that the recurring and brief nature of the visits here was not sufficient to establish reasonable suspicion.  Cf. Commonwealth v. St. George, 89 Mass. App. Ct. 764, 768 n.7 (2016) ("short trip" alone "not dispositive of criminal activity"); Commonwealth v. Jones, 95 Mass. App. Ct. 641, 647 (2019) (no reasonable suspicion where "officers knew that the defendant visited [area] frequently [but] had nothing connecting him to" criminal activity).  We also do not agree that the observed actions amounted to deliberate "concealment" by the defendants.  While "concealment can contribute to . . . reasonable suspicion," DePeiza, 449 Mass. at 373, the fact that activities are not in the open (i.e., are behind a fence) does not create reasonable suspicion

11

that a crime is being committed where the activities are as consistent with benign events as they are with concealment. See Commonwealth v. Evans, 87 Mass. App. Ct. 687, 693 (2015). Here the defendants' actions were no more suggestive of criminal activity than of innocuous brief encounters, such as food deliveries or visits from a family member or neighbor, and thus, in our view, do not sufficiently add to the reasonable suspicion analysis.[6]

Nor do we agree, on this record, that the detectives' familiarity with a past drug arrest and overdoses at the property tips the scale in favor of the Commonwealth. The testimony on this front was imprecise and spare. It at best established that two male residents had been arrested at the property some thirty months earlier, and that an individual or individuals had overdosed at the property at some time in the past. Moreover, nothing connected the defendants' visits to that past drug activity. There was not, for example, any testimony implicating the defendants in the prior arrests or overdoses, and no one testified that the defendants met with the

---

[6] The brief nature of the visits is unusual enough to be material, but without more the connection to criminal activity is too tenuous. The police saw a vehicle turn its lights off while parking, and an occupant briefly venture behind a fence in the dark -- events that occur daily, and innocently, at residential properties.

12

two occupants of the property who had been previously arrested.[7] See Commonwealth v. Evelyn, 485 Mass. 691, 709 (2020) ("previous crimes, without additional details," did not "demonstrate a 'direct connection' with the defendant or the [crime] at issue").  It is also significant, in our view, that the only testimony as to timing was that the arrests occurred some thirty months earlier.  More recent information might well have changed the calculus.  But the testimony was sufficiently dated that, without more, it carries little weight as to what was going on at the property at the time of the activities in question.  See Commonwealth v. Jones-Pannell, 472 Mass. 429, 435 (2015).

Finally, on this record the balance also is not tipped by the detectives' testimony that, based on their training and experience, the visits were consistent with drug sales.  It is of course true that reasonable suspicion is evaluated "in light of the officer's experience," and the application of experience to what an officer observed must be given serious consideration.  Commonwealth v. Pinto, 476 Mass. 361, 364 (2017).  Here, the detectives testified that the typical drug exchange is

---

[7] The CI reported that the defendants' meetings were with one Janice Bryant, who the judge found was an individual known to the detectives as a drug user.  That finding is unsupported by the record and thus clearly erroneous.  See Commonwealth v. Hilton, 450 Mass. 173, 178 (2007).  Neither detective who testified at the suppression hearing claimed that Bryant was a known drug user, testifying only that Bryant was a resident of the property.

"consummated quickly" without the chance for observers to "see the hand-to-hand transfer," and that the events at issue were "consistent with a street-level transaction."  But the detectives did not sufficiently explain how, based upon their limited observations, the events here were more suggestive of drug sales than other types of brief visit to a residential property.  See Commonwealth v. Houle, 35 Mass. App. Ct. 474, 477 (1993).

Both parties have cited case law that they believe supports their respective positions.  For its part, the Commonwealth points to Commonwealth v. Stewart, 469 Mass. 257, 261 (2014), where the Supreme Judicial Court held that an officer "had reasonable grounds to suspect that he had witnessed a drug transaction" based on (1) his knowledge that the defendant had previously been arrested for selling drugs to an undercover officer, and (2) his observation of "three persons follow[ing] the defendant down a . . . street often used by drug users, with [a] woman counting currency . . ., and then all four huddl[ing] briefly together in a doorway, before . . . dispers[ing]." Stewart is distinguishable, however, because the detectives here had no information connecting these defendants to drugs, and neither the CI nor the detectives observed an interaction of any type.  This case is instead closer to Kearse, 97 Mass. App. Ct. at 301-304.  There, this court found reasonable suspicion of a

14

drug exchange to be lacking, even where "an experienced investigator" observed a brief handshake "in a high crime area," because the handshake was a "normal social intercourse," and nothing else about the circumstances -- such as items being exchanged, money being counted, or prior knowledge of the defendant -- "point[ed] to criminal activity." Id. at 301-302. See also Commonwealth v. Barreto, 483 Mass. 716, 720-722 (2019).

In sum, we are not convinced that the stop here was supported by reasonable suspicion of criminal activity. As noted, however, reasonable suspicion is not a high bar, and an officer's observations on the street will frequently be sufficient to justify an investigatory stop. Indeed, Terry v. Ohio itself involved an officer's observations on the street, which led him to conclude that criminal activity was afoot, even though the officer did not see a weapon or any overtly criminal actions. See 392 U.S. at 22-23. The Supreme Court nevertheless stated that the "series of acts" that the officer observed, "each of them perhaps innocent in itself," "warranted further investigation" when "taken together." Id. at 22. What makes this case different from cases like Terry, in our view, is that the acts actually observed were not only "innocent in themselves" but commonplace -- to the point where a contrary ruling would sanction officers to engage in substantial "intrusion[s] upon . . . constitutionally protected interests,"

15

id. at 21, based on facts that do not distinguish the subject from innocent citizens going about their daily lives. Accordingly, the orders denying the motions to suppress physical evidence are vacated, and the cases are remanded to the Superior Court for further proceedings consistent with this memorandum and order.

So ordered.

By the Court (Blake, Englander & Walsh, JJ.[8]),

*Joseph F. Stanton*

Clerk

Entered: May 5, 2023.

---

[8] The panelists are listed in order of seniority.